# GOLLUST ET AL. *v.* MENDELL ET AL.

No. 90–659.  Argued April 15, 1991—Decided June 10, 1991

116

*Edwin B. Mishkin* argued the cause for petitioners. With him on the briefs were *Victor I. Lewkow* and *Thomas G. Dagger.*

*Irving Malchman* argued the cause for respondents and filed a brief for respondent Mendell.

*James R. Doty* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Roberts, Michael R. Dreeben, Paul Gonson, Jacob H. Stillman,* and *Thomas L. Riesenberg.*

JUSTICE SOUTER delivered the opinion of the Court.

Section 16(b) of the Securities Exchange Act of 1934, 48 Stat. 896, 15 U. S. C. § 78p(b),[1] imposes a general rule of

---

[1] The text of § 16(b) reads in full:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any pur-

strict liability on owners of more than 10% of a corporation's listed stock for any profits realized from the purchase and sale, or sale and purchase, of such stock occurring within a 6-month period. These statutorily defined "insiders," as well as the corporation's officers and directors, are liable to the issuer of the stock for their short-swing profits, and are subject to suit "instituted . . . by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer . . . ." *Ibid.*

Our prior cases interpreting § 16(b) have resolved questions about the liability of an insider defendant under the statute.[2] This case, in contrast, requires us to address a

chase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U. S. C. § 78p(b).

The phrase "beneficial owner, director, or officer" is defined in § 16(a) as "[e]very person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security . . . which is registered pursuant to [§ 12 of the 1934 Act], or who is a director or an officer of the issuer of such security . . . ." 15 U. S. C. § 78p(a).

[2] See *Foremost-McKesson, Inc.* v. *Provident Securities Co.*, 423 U. S. 232 (1976) (defendant must be 10% beneficial owner before purchase to be subject to liability for subsequent sale); *Kern County Land Co.* v. *Occidental Petroleum Corp.*, 411 U. S. 582 (1973) (binding option to sell stock

plaintiff's standing under § 16(b) and, in particular, the requirements for continued standing after the institution of an action. We hold that a plaintiff, who properly "instituted [a § 16(b) action as] the owner of [a] security of the issuer," may continue to prosecute the action after his interest in the issuer is exchanged in a merger for stock in the issuer's new corporate parent.

I

In January 1987, respondent Ira L. Mendell filed a complaint under § 16(b) against petitioners in the United States District Court for the Southern District of New York, stating that he owned common stock in Viacom International, Inc. (International), and was suing on behalf of the corporation. He alleged that petitioners, a collection of limited partnerships, general partnerships, individual partners and corporations, "operated as a single unit" and were, for purposes of this litigation, a "single . . . beneficial owner of more than ten per centum of the common stock" of International. App. to Pet. for Cert. 40a–42a. Respondent claimed that petitioners were liable to International under § 16(b) for approximately $11 million in profits earned by them from trading in International's common stock between July and October 1986. *Id.*, at 42a–43a. The complaint recited that respondent had made a demand upon International and its board of directors to bring a § 16(b) action against petitioners and that more than 60 days had passed without the institution of an action.

In June 1987, less than six months after respondent had filed his § 16(b) complaint, International was acquired by Arsenal Acquiring Corp., a shell corporation formed by Arsenal Holdings, Inc. (now named Viacom, Inc.) (Viacom), for the purpose of acquiring International. By the terms of the acquisition, Viacom's shell subsidiary was merged with Inter-

---

not a "sale" for purposes of § 16(b)); *Reliance Electric Co.* v. *Emerson Electric Co.*, 404 U. S. 418 (1972) (no liability for sales by defendant after its ownership interest fell below 10%); *Blau* v. *Lehman*, 368 U. S. 403 (1962) (partnership not liable under § 16(b) for trades by partner).

national, which then became Viacom's wholly owned subsidiary and only asset. The stockholders of International received a combination of cash and stock in Viacom in exchange for their International stock.[3] *Id.*, at 40a; App. 14–26.

As a result of the acquisition, respondent, who was a stockholder in International when he instituted this action, acquired stock in International's new parent corporation and sole stockholder, Viacom. Respondent amended his complaint to reflect the restructuring by claiming to prosecute the § 16(b) action on behalf of Viacom as well as International. App. to Pet. for Cert. 44a.

Following the merger, petitioners moved for summary judgment, arguing that respondent had lost standing to maintain the action when the exchange of stock and cash occurred, after which respondent no longer owned any security of International, the "issuer." The District Court held that § 16(b) actions "may be prosecuted only by the issuer itself or the holders of its securities," and granted the motion because respondent no longer owned any International stock.[4] App. to Pet. for Cert. 32a. The court concluded that only Viacom, as International's sole security holder, could continue to prosecute this action against petitioners. *Id.*, at 33a.

A divided Court of Appeals reversed. *Mendell ex rel. Viacom, Inc.* v. *Gollust*, 909 F. 2d 724 (CA2 1990). The majority saw nothing in the text of § 16(b) to require dismissal

---

[3] International stockholders who chose not to exchange their shares under the terms of the merger were afforded appraisal rights under Ohio law. App. 25–26. Respondent did not exercise his right to appraisal.

[4] Respondent also sought to sue derivatively on behalf of International. App. to Pet. for Cert. 44a. This "double derivative" claim was dismissed by the District Court. *Id.*, at 33a. Because of its disposition of respondent's § 16(b) claim, the Court of Appeals did not reach this issue. *Mendell ex rel. Viacom, Inc.* v. *Gollust*, 909 F. 2d 724, 731 (CA2 1990). Although respondent now "urges upon th[is] Court the validity of his double derivative action," Brief for Respondent 26, this issue was not properly presented to this Court for review and we do not reach it.

of respondent's complaint. "[T]he language of the statute speaks of the 'owner' of securities; but such language is not modified by the word 'current' or any like limiting expression. The statute does not specifically bar the maintenance of § 16(b) suits by former shareholders and Congress . . . could readily have eliminated such individuals." *Id.*, at 730. Since the provisions of the statute were open to "interpretation," the court relied on the statute's remedial purposes in determining "whether the policy behind the statute is best served by allowing the claim." *Id.*, at 728–729. The majority concluded that the remedial policy favored recognizing respondent's continued standing after the merger. "Permitting [respondent] to maintain this § 16(b) suit is not barred by the language of the statute or by existing case law, and it is fully consistent with the statutory objectives."[5] *Id.*, at 731. The summary judgment for petitioners was reversed.

The dissent took issue with this analysis, finding it to be in conflict with prior decisions of the Second Circuit and at least one other. See *Portnoy* v. *Kawecki Berylco Industries, Inc.*, 607 F. 2d 765, 767 (CA7 1979); *Rothenberg* v. *United Brands Co.*, CCH Fed. Sec. L. Rep. ¶ 96,045 (SDNY), aff'd mem., 573 F. 2d 1295 (CA2 1977).

We granted certiorari, 498 U. S. 1023 (1991), to resolve this conflict and to determine whether a stockholder who has properly instituted a § 16(b) action to recover profits from a

---

[5] The Court of Appeals observed:

"Here plaintiff's suit was timely, and while his § 16(b) suit was pending he was involuntarily divested of his share ownership in the issuer through a merger. But for that merger plaintiff's suit could not have been challenged on standing grounds. Although we decline—in keeping with § 16(b)'s objective analysis regarding defendants' intent—to inquire whether the merger was orchestrated for the express purpose of divesting plaintiff of standing, we cannot help but note that the incorporation of Viacom and the merger proposal occurred after plaintiff's § 16(b) claim was instituted. Hence, the danger of such intentional restructuring to defeat the enforcement mechanism incorporated in the statute is clearly present." 909 F. 2d, at 731.

corporation's insiders may continue to prosecute that action after a merger involving the issuer results in exchanging the stockholder's interest in the issuer for stock in the issuer's new corporate parent.

## II

## A

Congress passed § 16(b) of the 1934 Act to "preven[t] the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer." 15 U. S. C. § 78p(b). As we noted in *Foremost-McKesson, Inc.* v. *Provident Securities Co.*, 423 U. S. 232, 243 (1976): "Congress recognized that insiders may have access to information about their corporations not available to the rest of the investing public. By trading on this information, these persons could reap profits at the expense of less well informed investors." Prohibiting short-swing trading by insiders with nonpublic information was an important part of Congress' plan in the 1934 Act to "insure the maintenance of fair and honest markets," 15 U. S. C. § 78b; and to eliminate such trading, Congress enacted a "flat rule [in § 16(b)] taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Electric Co.* v. *Emerson Electric Co.*, 404 U. S. 418, 422 (1972); see also *Kern County Land Co.* v. *Occidental Petroleum Corp.*, 411 U. S. 582, 591–595 (1973).

The question presented in this case requires us to determine who may maintain an action to enforce this "flat rule." We begin with the text. Section 16(b) imposes liability on any "beneficial owner, director, or officer" of a corporation for "any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of [an] issuer . . . within any period of less than six months." 15 U. S. C. § 78p(b). A "[s]uit to recover [an insider's] profit may be instituted . . . by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer . . . ." *Ibid.*

The statute imposes a form of strict liability on "beneficial owner[s]," as well as on the issuer's officers and directors, rendering them liable to suits requiring them to disgorge their profits even if they did not trade on inside information or intend to profit on the basis of such information. See *Kern County Land Co.* v. *Occidental Petroleum Corp., supra,* at 595. Because the statute imposes "liability without fault within its narrowly drawn limits," *Foremost-McKesson, Inc.* v. *Provident Securities Co., supra,* at 251, we have been reluctant to exceed a literal, "mechanical" application of the statutory text in determining who may be subject to liability, even though in some cases a broader view of statutory liability could work to eliminate an "evil that Congress sought to correct through § 16(b)." *Reliance Electric Co.* v. *Emerson Electric Co., supra,* at 425.

To enforce this strict liability rule on insider trading, Congress chose to rely solely on the issuers of stock and their security holders. Unlike most of the federal securities laws, § 16(b) does not confer enforcement authority on the Securities and Exchange Commission. It is, rather, the security holders of an issuer who have the ultimate authority to sue for enforcement of § 16(b). If the issuer declines to bring a § 16(b) action within 60 days of a demand by a security holder, or fails to prosecute the action "diligently," 15 U. S. C. § 78p(b), then the security holder may "institut[e]" an action to recover insider short-swing profits for the issuer. *Ibid.*

In contrast to the "narrowly drawn limits" on the class of corporate insiders who may be defendants under § 16(b), *Foremost-McKesson, Inc.* v. *Provident Securities Co., supra,* at 251, the statutory definitions identifying the class of plaintiffs (other than the issuer) who may bring suit indicate that Congress intended to grant enforcement standing of considerable breadth. The only textual restrictions on the standing of a party to bring suit under § 16(b) are that the plaintiff

must be the "owner of [a] security" of the "issuer" at the time the suit is "instituted."

Although plaintiffs seeking to sue under the statute must own a "security," § 16(b) places no significant restriction on the type of security adequate to confer standing. "[A]ny security" will suffice, 15 U. S. C. § 78p(b), the statutory definition being broad enough to include stock, notes, warrants, bonds, debentures, puts, calls, and a variety of other financial instruments; it expressly excludes only "currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months . . . ." § 78c(a)(10); see also *Reves* v. *Ernst & Young*, 494 U. S. 56 (1990). Nor is there any restriction in terms of either the number or percentage of shares, or the value of any other security, that must be held. See *Portnoy* v. *Revlon, Inc.*, 650 F. 2d 895, 897 (CA7 1981) (plaintiff bought single share); *Magida* v. *Continental Can Co.*, 231 F. 2d 843, 847–848 (CA2) (plaintiff owned 10 shares), cert. denied, 351 U. S. 972 (1956). In fact, the terms of the statute do not even require that the security owner have had an interest in the issuer at the time of the defendant's short-swing trading, and the courts to have addressed this issue have held that a subsequent purchaser of the issuer's securities has standing to sue for prior short-swing trading. See, *e. g.*, *Dottenheim* v. *Murchison*, 227 F. 2d 737, 738–740 (CA5 1955), cert. denied, 351 U. S. 919 (1956); *Blau* v. *Mission Corp.*, 212 F. 2d 77, 79 (CA2), cert. denied, 347 U. S. 1016 (1954).

The second requirement for § 16(b) standing is that the plaintiff own a security of the "issuer" whose stock was traded by the insider defendant. An "issuer" of a security is defined under § 3(a)(8) of the 1934 Act as the corporation that actually issued the security, 15 U. S. C. § 78c(a)(8), and does not include parent or subsidiary corporations.[6] While this

---

[6] Cf. § 2(11) of the Securities Act of 1933, 15 U. S. C. § 77b(11) (definition of "issuer" for certain purposes is "any person directly or indirectly

requirement is strict on its face, it is ostensibly subject to mitigation in the final requirement for § 16(b) standing, which is merely that the plaintiff own a security of the issuer at the time the § 16(b) action is "instituted." Today, as in 1934, the word "institute" is commonly understood to mean "inaugurate or commence; as to institute an action." Black's Law Dictionary 985–986 (3d ed. 1933) (citing cases); see Black's Law Dictionary 800 (6th ed. 1990) (same definition); Random House Unabridged Dictionary of the English Language 988 (2d ed. 1987) ("to set in operation; to institute a lawsuit"). Congressional intent to adopt this common understanding is confirmed by Congress' use of the same word elsewhere to mean the commencement of an action. See, *e. g.*, 8 U. S. C. § 1503(a) ("action . . . may be instituted only within five years after . . . final administrative denial"); 42 U. S. C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Secretary or any vacancy in such office").

The terms of § 16(b), read in context, thus provide standing of signal breadth, expressly limited only by conditions existing at the time an action is begun. Petitioners contend, however, that the statute should at least be read narrowly enough to require the plaintiff owning a "security" of the "issuer" at the time the action is "instituted" to maintain ownership of the issuer's security throughout the period of his participation in the litigation. See Brief for Petitioners 11. But no such "continuous ownership requirement," *ibid.*, is found in the text of the statute, nor does § 16(b)'s legislative history reveal any congressional intent to impose one.

This is not to say, of course, that a § 16(b) action could be maintained by someone who is subsequently divested of any interest in the outcome of the litigation. Congress clearly intended to put "a private-profit motive behind the uncovering of this kind of leakage of information, [by making] the

---

controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer").

stockholders [its] policemen." Hearings on H. R. 7852 and H. R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 136 (1934) (testimony of Thomas G. Corcoran) (hereinafter Hearings). The sparse legislative history on this question, which consists primarily of hearing testimony by one of the 1934 Act's drafters, merely confirms this conclusion.[7]

Congress must, indeed, have assumed any plaintiff would maintain some continuing financial stake in the litigation for a further reason as well. For if a security holder were allowed to maintain a § 16(b) action after he had lost any financial interest in its outcome, there would be serious constitutional doubt whether that plaintiff could demonstrate the standing required by Article III's case-or-controversy limitation on federal court jurisdiction. See *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 804 (1985) (Article III requires "the party requesting standing [to allege] 'such a personal stake in the outcome of the controversy as to assure that concrete ad-

---

[7] Petitioners have directed our attention only to a statement by Thomas G. Corcoran, a principal drafter of the statute, at one of the hearings on the 1934 Act. Corcoran testified that Congress could be confident that § 16(b) would be enforced because the enactment of the statute would "[say] to all of the stockholders of the company, 'You can recover any of this profit for your own account, if you find out that any such transactions are going on.'" Hearings 136. This statement was not, of course, a complete description of the class of plaintiffs entitled to § 16(b) standing, since "any security [holder]" may sue, not just stockholders. 15 U. S. C. § 78p(b). Nor was it meant as a precise description of a plaintiff's incentive to sue; the witness elsewhere made it clear that a stockholder plaintiff (or any other security holder) would not directly receive any recovery, but would be suing solely on the corporation's behalf:

"The fact that the stockholders, with an interest, are permitted to sue *to recover that profit for the benefit of the company*, puts anyone doing this particular thing, in the position of taking [a] risk that somebody with a profit motive will try to find out." Hearings 137 (emphasis added).

Corcoran's analysis does, however, demonstrate the statute's reliance for its enforcement on the profit motive in an issuer's security holders, a dependence that could hardly cease the moment after suit was filed.

126

verseness which sharpens the presentation of issues'") (quoting *Baker* v. *Carr*, 369 U. S. 186, 204 (1962)); see also. *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 472 (1982). Although "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules," *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975), "Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself." *Ibid.* Moreover, the plaintiff must maintain a "personal stake" in the outcome of the litigation throughout its course. See *United States Parole Comm'n* v. *Geraghty*, 445 U. S. 388, 395–397 (1980).

Hence, we have no difficulty concluding that, in the enactment of § 16(b), Congress understood and intended that, throughout the period of his participation, a plaintiff authorized to sue insiders on behalf of an issuer would have some continuing financial interest in the outcome of the litigation, both for the sake of furthering the statute's remedial purposes by ensuring that enforcing parties maintain the incentive to litigate vigorously and to avoid the serious constitutional question that would arise from a plaintiff's loss of all financial interest in the outcome of the litigation he had begun. See *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932) ("When the validity of an act of Congress is drawn in question, and even if a serious doubt of constitutionality is raised, . . . this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided"); see also *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 465–466 (1989); *id.*, at 481 (KENNEDY, J., concurring in judgment).

B

The conclusion that § 16(b) requires a plaintiff security holder to maintain some financial interest in the outcome of the litigation does not, however, tell us whether an adequate financial stake can be maintained when the plaintiff's interest

in the issuer has been replaced by one in the issuer's new parent. We think it can be.

The modest financial stake in an issuer sufficient to bring suit is not necessarily greater than an interest in the original issuer represented by equity ownership in the issuer's parent corporation. A security holder eligible to institute suit will have no direct financial interest in the outcome of the litigation, since any recovery will inure only to the issuer's benefit. Yet the indirect interest derived through one share of stock is enough to confer standing, however slight the potential marginal increase in the value of the share. A bondholder's sufficient financial interest may be even more attenuated, since any recovery by the issuer will increase the value of the bond only because the issuer may become a slightly better credit risk.

Thus, it is difficult to see how such a bondholder plaintiff, for example, is likely to have a more significant stake in the outcome of a § 16(b) action than a stockholder in a company whose only asset is the issuer. Because such a bondholder's attenuated financial stake is nonetheless sufficient to satisfy the statute's initial standing requirements, the stake of a parent company stockholder like respondent should be enough to meet the requirements for continued standing, so long as that is consistent with the text of the statute. It is consistent, of course, and in light of the congressional policy of lenient standing, we will not read any further condition into the statute, beyond the requirement that a § 16(b) plaintiff maintain a financial interest in the outcome of the litigation sufficient to motivate its prosecution and avoid constitutional standing difficulties.

## III

In this case, respondent has satisfied the statute's requirements. He owned a "security" of the "issuer" at the time he "instituted" this § 16(b) action. In the aftermath of International's restructuring, he retains a continuing financial interest in the outcome of the litigation derived from his stock in

International's sole stockholder, Viacom, whose only asset is International. Through these relationships, respondent still stands to profit, albeit indirectly, if this action is successful, just as he would have done if his original shares had not been exchanged for stock in Viacom. Although a calculation of the values of the respective interests in International that respondent held as its stockholder and holds now as a Viacom stockholder is not before us, his financial interest is actually no less real than before the merger and apparently no more attenuated than the interest of a bondholder might be in a § 16(b) suit on an issuer's behalf.

The judgment of the Court of Appeals is, accordingly, affirmed.

*It is so ordered.*