**Deborah DONOGHUE, Plaintiff,**

v.

**CASUAL MALE RETAIL GROUP, INC. and Jewelcor Management Inc., Defendants.**

**No. 03 CIV. 1037(KMW).**

United States District Court, S.D. New York.

March 31, 2005.

David Lopez, Southampton, NY, for Plaintiff.

Alan Roy Friedman, Kramer, Levin, Naftalis & Frankel, LLP, Amy Busa, Fixler & LaGuttuta, Dennis H. Tracey, III, Robert Brian Black, Hogan & Hartson LLP, New York, NY, George A. Reihner, Elliott, Reihner, Siedzikowski & Egan P.C., Scranton, PA, Richard L. Huffsmith, Jewelcor Companies, Wilkes–Barre, PA, for Defendants.

### ORDER

KIMBA M. WOOD, District Judge.

Deborah Donoghue ("Plaintiff") brings this shareholder action, pursuant to Section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)"), 15 U.S.C. § 78p(b)(2005), against Defendants Casual Male Retail Group, Inc. ("Casual Male") and its beneficial owner, Jewelcor Management, Inc. ("Jewelcor"). Plaintiff seeks to

recover "short-swing" profits that she alleges Jewelcor realized from the purchase and sale of Casual Male common stock within a six-month period.

Plaintiff moves for summary judgment with respect to liability and damages; Defendants oppose Plaintiff's motion and cross-move for summary judgment.[1] For the reasons set forth below, the Court grants Plaintiff's motion for summary judgment and, accordingly, denies Defendants' motion for summary judgment.

## I. *Background*

Unless otherwise noted, the following facts are derived from the parties' Stipulation of Undisputed Facts and Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Rule 56.1 Statement").

At all times relevant to the instant action, Plaintiff was, and continues to be, a shareholder of Casual Male. Rule 56.1 Statement, ¶ 3. Casual Male retained Jewelcor to render management and consulting services as an independent contractor in October 1999. *Id.* at ¶ 4; *see* Consulting Agreement, dated Oct. 28, 1999, *id.* at Ex. A. Pursuant to a Non–Qualified Stock Option Agreement, which served as partial compensation for Jewelcor's consulting services, Casual Male granted Jewelcor an Option to purchase 400,000 shares of its common stock at a fixed price of $1.156 per share, on or prior to April 28, 2002 (the "Option"). Option Agreement, dated Oct. 28, 1999, *id.* at Ex. B. The Agreement indicated that payment for the Option could be made (i) by cash or check, (ii) "in the form of shares of Common Stock that

are not then subject to any restrictions," or (iii) by notice with instructions to a broker to deliver cash or check. *Id.*

Between November 21, 2001 and January 2, 2002, Jewelcor made open-market purchases of 62,951 shares of Casual Male common stock at prices of between $2.24 and $3.02 per share. *Id.* at ¶ 16. On April 18, 2002, Jewelcor exercised the above-described Option by surrendering 79,467 Casual Male shares, at the contemporaneous fair market value of $5.82 per share. *Id.* at ¶ 15. On October 3, 2002, Jewelcor bought 11,500 Casual Male shares at $3.35 per share; the following day, Jewelcor bought an additional 12,000 Casual Male shares at $3.26 per share; and on October 14, 2002, Jewelcor bought 1,610 Casual Male shares at $3.12 per share. Plnt.'s Supp. Statement of Material Facts ("Plnt.'s Supp. Statement"). ¶ 2.[2]

Jewelcor was the beneficial owner of more than 10% of Casual Male common stock at all relevant times. Rule 56.1 Statement, ¶ 17. Jewelcor was 100% owned by Jewelcor Incorporated, which was 100% owned by SH Holdings Incorporated, which was 93% owned by Seymour Holtzman ("Holtzman") and his wife, Evelyn Holtzman. *Id.* at ¶ 13. When Casual Male granted Jewelcor the Option, Holtzman was the President of Jewelcor and the Chairman of its Board of Directors. *Id.* at ¶ 8. Subsequent to the Option grant, and at the time Jewelcor surrendered the 79,467 Casual Male shares to exercise the Option, Holtzman was an officer and director of Casual Male. *Id.* at ¶¶ 9, 15. Jewelcor was never an officer or director of Casual Male. *Id.* at ¶ 14.

---

1. Defendant Casual Male joins Defendant Jewelcor in its opposition to Plaintiff's motion for summary judgment and its cross-motion for summary judgment, relying upon Jewelcor's memoranda of law. *See* Joinder of Defendant Casual Male Retail Group, Inc., dated Dec. 22, 2003.

2. Defendants object to paragraphs 1 and 3 of Plaintiff's Supplemental Statement of Material Facts, but not to paragraph 2. Deft.s' Supp. Statement of Material Facts, ¶ 7.

On October 18, 2002 Plaintiff made a demand for prosecution, pursuant to Section 16(b) of the Exchange Act, on Casual Male. Complaint, ¶ 5; Casual Male's Answer, ¶ 5; Jewelcor's Answer, ¶ 5, Casual Male denied Jewelcor's liability and refused to bring suit. *Id.* Over sixty days after Plaintiff's demand, but within two years of the alleged transactions, Plaintiff commenced the instant action. Complaint, ¶ 7; *see* 15 U.S.C. § 78(p)(b) ("Suit to recover such profit may be instituted...by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request...; but no such suit shall be brought more than two years after the date such profit was realized.").

## II. *Discussion*

### A. Standard of Review on a Motion for Summary Judgment

Summary judgment is properly granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law governing a case will identify those facts that are material, and only disputes over relevant or necessary facts "that might

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Courts in the Second Circuit "have recognized the propriety of a [summary judgment] disposition in Section 16(b) actions where the parties do not contest the facts." *Morales v. Gould Investors Trust,* 445 F.Supp. 1144 (S.D.N.Y.1977), *aff'd* 578 F.2d 1369 (2d Cir.1978). However, even when both parties assert the absence of any genuine issues of material fact and cross-move for summary judgment, a court need not enter judgment for either party. *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 120 (2d Cir.2001). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

### B. Liability under Section 16(b) of the Exchange Act

Section 16(b) of the Exchange Act "imposes a general rule of strict liability on owners of more than 10% of a corporation's listed stock for any profits realized from the purchase and sale, or sale and purchase, of such stock occurring within a 6–month period." *Gollust v. Mendell,* 501 U.S. 115, 116–117, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991); *see* 15 U.S.C. § 78p(b).[3] The expressly stated purpose

---

**3.** The text of Section 16(b), governing "Profits from purchase and sale of security within six months," reads:

> For the purpose of preventing the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him for any purchase and sale, or any sale and purchase, of any equity security of such issuer...or a security-based swap agree-

ment...involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such a transaction of holding the security or security-based swap agreement purchased or of not repurchas-

of this Section is to "prevent[ ] the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer." 15 U.S.C. § 78p(b); *see Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972) ("[F]ederal courts...have recognized that the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great."); *Foremost–McKesson, Inc. v. Provident Securities Co.,* 423 U.S. 232, 243–55, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976) (discussing the general purpose and legislative history of Section 16(b)).

■ Section 16(b) renders insiders "liable to suits requiring them to disgorge their profits even if they did not trade on inside information or intend to profit on the basis of such information." *Gollust,* 501 U.S. at 122, 111 S.Ct. 2173; *see* 15 U.S.C. § 78p(b) ("any profit realized...shall inure and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner..."); *accord Rosen ex rel. Price Communications Corp. v. Price,* 1997 WL 401793, *1, 1997 U.S. Dist. Lexis 10274, *11 (S.D.N.Y. July 16, 1997) (noting that the statute has been described as "harsh," "crude," and "Draconian," because "liability under § 16(b) attaches even if there is no proof that the defendant intended to profit from inside information"). For this strict liability to attach to a transaction, the plaintiff must show that there was "(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within in a six-month period." *Gwozdzinsky ex rel. Revco D.S. v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 308 (2d Cir.1998).

■ When confronted with "unorthodox" or "borderline" transactions that are not "classic purchases and sales for cash" within the literal terms of the statute, courts look to the legislative purpose behind Section 16(b), applying a "potential for speculative abuse" test on a case-by-case basis. *Steel Partners II, L.P. v. Bell Indus., Inc.,* 315 F.3d 120, 124 (2d Cir. 2002); *Lane Bryant, Inc. v. Hatleigh Corp.,* 517 F.Supp. 1196, 1201 (S.D.N.Y. 1981); *Tyco Laboratories, Inc. v. Cutler–Hammer, Inc.* 490 F.Supp. 1, 4 (S.D.N.Y. 1980).

> In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information.... Thus, "in interpreting the terms 'purchase' and 'sale,' courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse."

*Kern County Land Co. v. Occidental Petroleum Corp.* 411 U.S. 582, 593–595, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) (quoting *Reliance,* 404 U.S. at 424, n. 4, 92 S.Ct. 596). The two primary "indices" used for measuring the potential for speculative abuse are (1) the defendant's access to inside information (as distinguished from possession of it), and (2) the defendant's ability to influence the timing and circum-

ing the security or security-based swap agreement sold for a period exceeding six months. 15 U.S.C. § 78p(b).
Section 16(a) of the Act defines a beneficial owner as a person who directly or indirectly owns "more than 10 per centum of any class of any equity security" of the issuer. 15 U.S.C. § 78p(a).

stances of the transaction at issue. *Makofsky v. Ultra Dynamics Corp.*, 383 F.Supp. 631, 638 (S.D.N.Y.1974) (*citing Kern*, 411 U.S., at 597–600, 93 S.Ct. 1736); *Rosen*, 1997 WL 401793, at *1, 1997 U.S. Dist. Lexis 10274, at *22.

In the present case, it is undisputed that Jewelcor was the beneficial owner of more than 10% of Casual Male's common stock when Jewelcor made open-market purchases of 62,951 Casual Male shares between November 2001 and January 2002, when it surrendered 79,467 Casual Male shares in April 2002, and when it purchased 25,110 Casual Male shares in October 2002. Local Rule 56.1 Statement, ¶¶ 15–17; Plnt.'s Supp. Statement, ¶ 2. Defendants argue, however, that Section 16(b) does not apply to these transactions, because Jewelcor's surrender of 79,467 shares did not constitute a sale of securities from which profits could be realized.

### (i) *Derivative Securities*

■ The first question the Court must address is whether Jewelcor's surrender of shares is exempt from Section 16(b) liability on the ground that it relates to the exercise of a derivative security. The Option that Jewelcor acquired through the October 28, 1999 Stock Option Agreement—the option to buy 400,000 Casual Male shares at a fixed price before a certain date—was a derivative security. *See* 17 C.F.R. § 240.16a–1(c) ("The term derivative security shall mean any option...with an exercise or conversion privilege at a price related to an equity security"). According to Rule 16b–6, the

"establishment" of the option "shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Act"; whereas, "the acquisition of underlying securities at a fixed price due to the exercise" of the option "shall be exempt from the operation of section 16(b) of the Act." 17 C.F.R. 240.16b–6(a),(b); *see Magma Power Co. v. Dow Chem., Co.*, 136 F.3d 316, 322 (2d Cir.1998) ("the *acquisition* of a fixed-price option—rather than its *exercise*—is the triggering event for Section 16(b) purposes...[b]ecause the acquisition or disposition of the option is the point at which the inside information may be advantageous") (emphasis in original).

Thus, Jewelcor acquired Casual Male shares for Section 16(b) purposes on October 28, 1999, when it was granted the option to purchase these shares. Jewelcor did not acquire Casual Male shares for Section 16(b) purposes when it exercised the Option on April 18, 2002. Jewelcor's surrender of 79,467 Casual Male shares to exercise the Option, however, is not exempt from Section 16(b) liability. Rule 16a–1 specifically states that the term derivative securities "shall not include...[r]ights or obligations to surrender a security, or have a security withheld, upon the receipt or exercise of a derivative security." 17 C.F.R. 240.16a–1(c)(3).[4]

### (ii) *Occurrence of a 'Sale'*

Given that Jewelcor's surrender of shares is not exempt under Rule 16b–6 as a derivative security, the Court must consider whether the transaction constituted a sale for purposes of Section 16(b) liability.

4. *Rosen v. Drisler*, which Defendants cite in support of their argument that the surrender of shares is not a sale, is not only outdated, but also unhelpful to Defendants' case. *See* 421 F.Supp. 1282 (S.D.N.Y.1976). In *Rosen*, the plaintiff contended that the surrender of a stock option constituted a simultaneous purchase and sale of shares. The court held that the instantaneous nature of this transaction eliminated the possibility of insider speculative abuse. *Id.* at 1287–88. The present case, in contrast, involves purchases that took place several months before and after the alleged sale, leaving an ample span of time for insider speculative abuse.

Section 3(a) of the Act defines "sale" to include "any contract to sell or otherwise dispose of" securities. 15 U.S.C. § 78c(a)(14). The Supreme Court has recognized that the "statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase." *Kern*, 411 U.S. at 593, 93 S.Ct. 1736; *accord Gould Investors*, 445 F.Supp. at 1149–50 (providing examples of courts "liberal interpretation as to what can be a 'purchase' or 'sale' "). Jewelcor's act of surrendering 79,467 Casual Male shares to exercise the Option did entail a "disposing of" securities, and thus appears to fall within the broad definition of "sale."

■ However, because the transaction is a sufficiently "unorthodox" type of sale, the Court finds that a "potential for speculative abuse" analysis is warranted. *See Gould Investors*, 445 F.Supp. at 1153. Such an analysis reveals that the instant transaction did have potential for the type of abuse Congress sought to prevent. Jewelcor purchased Casual Male shares between November 2001 and January 2002 at significantly lower prices than it received for the 79,467 Casual Male shares it surrendered in April 2002. Local Rule 56.1 Statement, ¶¶ 15–16. Because Jewelcor was a beneficial owner of Casual Male at all relevant times, it could have had access to inside information that Casual Male's stock price would rise between January and April 2002—especially given that the President, director, and controlling shareholder of Jewelcor was also an officer and director of Casual Male, subsequent to the Option grant and at the time of its exercise. *Id.* at ¶¶ 8–9; *see Gould Investors*, 445 F.Supp. at 1154 (holding that defendants' positions as insiders established that they had access to inside information, which was sufficient to constitute evidence of speculative abuse). Moreover,

there was a sufficient "span of time between the 'purchase[s]' and 'sale' in which the market could fluctuate" to give rise to the "possibility for insider speculative abuse." *See Rosen v. Drisler*, 421 F.Supp. 1282 (S.D.N.Y.1976). Although there is no evidence that Jewelcor actually used inside information in this manner, "actual use of such information is not the target of this Court's inquiry under the access-to-information factor." *Gould Investors*, 445 F.Supp. at 1154.

In addition, Jewelcor was not bound to acquire or surrender any Casual Male shares at any particular time. Rather, Jewelcor could control when it would surrender the Casual Male shares to exercise the Option, as long as it did so before the deadline of April 28, 2002. Local Rule 56.1 Statement, Ex. B; *see Gould Investors*, 445 F.Supp. at 1154 ("the manifest ability of the defendants to dictate the timing of the transfers in question...bodes towards a potential for speculative abuse").

The Court concludes that Jewelcor did purchase and sell Casual Male securities during a six-month period, while a beneficial owner of Casual Male, within the meaning of Section 16(b). Because the sale in question was "unorthodox," liability is predicated on the determination that Jewelcor's transactions involved the potential for the type of speculative abuse that Congress intended Section 16(b) to prevent.

## C. Exemption from Liability under Rule 16b–3

Defendants argue that even if Jewelcor's cashless exercise of the Option is deemed to constitute a sale of shares, Rule 16b–3 of the Exchange Act, 17 C.F.R. 240.16b–3, exempts the transaction from Section 16(b) liability, because Jewelcor was "merely the corporation through which Holtzman, a director of Casual Male, exercised the [Op-

tion] which [was] received as compensation for personal services rendered to the issuer, pursuant to a board-approved agreement." Deft.s' Brief, 5.

### (i) *Rule 16b–3 Exemption*

■ Rule 16b–3, which applies only to officers and directors of the issuer, provides that "any transaction involving a grant, award or other acquisition from the issuer" or "the disposition to the issuer of issuer equity securities" shall be exempt from Section 16(b) liability, "provided that the terms of such disposition are approved in advance by the board of directors of the issuer...." 17 C.F.R. 240.16b–3(a),(d),(e).[5] To qualify for this "Board Approval Exemption," a transaction must meet three requirements: "(1) [It] must involve the defendant acquiring issuer equity securities from the issuer; (2) The defendant must be a director or officer of the issuer at the time of the transaction; and (3) The transaction must be approved in advance by the issuer's board of directors." *Gryl ex rel. Shire Pharms, Group PLC v. Shire Pharms Group PLC,* 298 F.3d 136, 141 (2d Cir.2002), *cert. denied,* 537 U.S. 1191, 123 S.Ct. 1262, 154 L.Ed.2d 1024 (2003).

Plaintiff contends that Rule 16b–3 is inapplicable to the present action, because Jewelcor was never an officer or director of Casual Male, Plnt.'s Brief, 8. However, Defendants argue that Holtzman's status as a director of Casual Male at the time that Jewelcor surrendered the shares should be imputed to Jewelcor, because Holtzman was the de facto beneficial owner of the Casual Male shares that Jewelcor purchased and sold within six month periods. Deft.s' Brief, 5–6.

### (ii) *Beneficial Ownership under Rule 16a–1*

In 1991, the Securities and Exchange Commission (S.E.C.) promulgated Rule 16a–1 of the Exchange Act, 17 C.F.R. 240.16a–1, creating "a two-tiered analysis of beneficial ownership." *Quintel Entm't,* 249 F.3d at 122. Rule 16a–1 first defines a beneficial owner "solely for the purpose of determining whether a person is a beneficial owner of more than ten percent of any class of securities," as any person who meets the description of beneficial owner under Section 13(d) of the Act and its accompanying rules.[6] 17 C.F.R. 240.16a–1(a)(1). The second part of Rule 16a–1 defines a beneficial owner, for all other purposes, as "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities." 17 C.F.R. 240.16a–1(a)(2). The Rule describes "pecuniary interest" as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R. 240.16a–1(a)(2)(i).

Rule 16a–1's second definition of beneficial owner "was designed to 'codify the courts' emphasis [7] on pecuniary interests

---

**5.** Note 3 to Rule 16b–3 states that the Board of Directors must grant approval for "each specific transaction," and not just "approval of a plan in its entirety," unless the terms and conditions of each transaction are fixed in advance. 17 C.F.R. 240.16b–3, Note 3.

**6.** This definition "focuses on control, not on pecuniary benefits," *Quintel Entm't,* 249 F.3d at 122, because Rule 13(d) describes the beneficial owner of a security as "any person who,

directly or indirectly...has or shares: (1) voting power...and/or, (2) investment power" over the security. 17 C.F.R. 240.12d–3(a)(1)–(2) (2005).

**7.** *See Popkin v. Dingman,* 366 F.Supp. 534 (S.D.N.Y.1973) (pre-Rule 16a–1 holding that directors and officers of an insider corporation were not liable for individually selling shares within six months of the corporation's transaction, because they did not control the

and deem that indirect pecuniary interests are sufficient to establish a reporting obligation and the potential for short-swing profit recovery with respect to those securities.'" *Feder ex rel. Ivax Corp. v. Frost*, 220 F.3d 29, 33–34 (2d Cir.2000) (quoting Ownership Reports and Trading by Officers, Directors and Principal Stockholders, Exchange Act Release No. 34–26333, 53 Fed.Reg. ¶ 49,997, at 50,001 (Dec. 13, 1998)). Thus, once 10% status is determined, the Rule's pecuniary-based definition of beneficial ownership "comes into play for purposes of the reporting and short-swing profit provisions of Section 16." *Id.*

At all relevant times, Holtzman directly owned 93% of capital stock in SH Holdings, Inc., which wholly owned Jewelcor, Inc., which wholly owned Jewelcor. 56.1 Statement, ¶ 13. Thus, Holtzman had a pecuniary interest in, and was the beneficial owner under Rule 16a–1, of the Casual Male shares that Jewelcor surrendered to purchase the Option.[8]

### (iii) *Applicability of Rule 16b–3*

The Second Circuit has observed that "[p]romulgating a definition of 'beneficial owner' that includes statutory insiders who have an indirect pecuniary interest in securities in no way undermines Section 16(b)'s objectives.... At worst, Rule 16a–1(a)(2) gives a slightly expansive reading to the term 'profit realized' as used in Section 16(b) ...." *Feder*, 220 F.3d at 36. In the present case, however, Defendants argue for an expanded interpretation, not to widen the reach of Section 16(b), but rather, to apply one of its exceptions.

As Defendants point out, the question as to whether this is permissible was posed to the S.E.C. in a general letter of inquiry by the American Bar Association. Deft.s' Brief, 6; *see* American Bar Ass'n, SEC No–Action Letter, 1999 WL 61837 (Jan. 10, 1999) (asking whether Rule 16b–3 "may be relied upon to exempt an insider's indirect pecuniary interest in transactions with the issuer conducted through other parties," such as a "corporation in which beneficial ownership of the securities is reportable by the insider pursuant to Rule 16a–1(a)(2)"). The S.E.C. replied:

> In order to satisfy the specificity requirements of Note 3 to Rule 16b–3 for purposes of applying the approval conditions of Rules 16b–3(d) and 16b–3(e) to these transactions, the approving entity must know and the document evidencing the approval must specify:
>
> ● the existence and extent of the officer's or director's indirect interest in the transaction; and
>
> ● that the approval is granted for purposes of making the transaction exempt under Rule 16b–3.

*Id.*[9]

The board-approved Stock Option Agreement that granted Jewelcor permis-

---

corporation's sale or realize a profit from it); *Whiting v. Dow Chem. Co.*, 523 F.2d 680, 685 (2d Cir.1975) (pre-Rule 16a–1 case interpreting beneficial owner to mean "equitable owner, as well as a 10% owner"); *Blau v. Mission Corp.*, 212 F.2d 77, 80 (2d Cir.1954) (pre-Rule 16a–1 holding that defendant corporation was liable as an insider "by virtue of its absolute control" over another company, which was an insider of the issuer).

8. Plaintiff has pointed out that Holtzman did not contemporaneously file any Forms 4 with

respect to either the grant of the Option to Jewelcor in 1999 or its exercise of the Option in 2002. Plnt.'s Opp. and Reply, 8. However, information included or excluded from Forms 4 "cannot fairly be said to be persuasive in resolving the question of statutory interpretation with respect to § 16(b) liability." *Quintel Entm't*, 249 F.3d at 129.

9. The above statement by the SEC is not binding on this Court, but the Court may rely on it for its persuasive value. *Quintel Entm't*,

sion to surrender Casual Male shares in exchange for the Option did not specify the existence and extent of Holtzman's interest in the transaction, because he was neither a director nor an officer of Casual Male at the time; the document never even mentioned Holtzman. In addition, the Consulting Agreement between Jewelcor and Casual Male mentioned Holtzman only among a string of five other names of "individuals to perform Services hereunder." 56.1 Statement, Ex. A, at 2.[10]

Similarly, the Board could not have specified that its approval of the Option granted Holtzman a Rule 16b–3 exemption as a director or officer of Casual Male, because he was not a director or officer of Casual Male at the time the Option was granted. Instead, the Consulting Agreement specified that Jewelcor would be performing the consulting services "as an 'independent contractor' and not as agent or employee of the Corporation." *Id.* at 4.

The Second Circuit has rejected the view that the Board Approval Exemption does not apply if the board of the issuer company approves an option plan in advance of the defendants becoming directors of the issuer company. *Gryl,* 298 F.3d at 144. "All that is required under Rule 16b–3(d)(1) is that the securities transaction, at the time it subsequently occurs, be between the issuer and a director or officer of the issuer." *Id.* at n. 7. In addition, the *Gryl* court declined to read a purpose-specific approval requirement into Rule 16b–3. *Id.* at 145. However, the court did emphasize that in order to meet the specificity requirements of Rule 16b–3, the board-approved option plan must be "sufficiently prescriptive in order

to 'prevent insiders from having, directly or indirectly, any control over the terms of their own awards, and therefore removes the ability of insiders to time their acquisitions under the plan to take advantage of inside information.'" *Id.* at 142–143 (exempting directors from Section 16(b) liability because the board-approved plan gave defendants "no discretion unilaterally to alter in their favor the amount, price, timing and exercise terms of the impending option conversion").

In the present case, Holtzman did have the ability to alter the timing and exercise terms of the Option in his favor. Whereas the *Gryl* defendants' shares were automatically converted at the time of a merger, Jewelcor could elect to exercise its Option at any time within a period of over three years. Moreover, Jewelcor could choose to exercise the Option in several different ways, including in cash or in Casual Male stock. The Court thus finds that the board-approved agreement was not specific enough "to ensure that any short-swing profit taking that follows is not the result of unfair market manipulation." *Id.* at 146. Accordingly, Jewelcor's sale of Casual Male shares within six months of purchase are not exempt from Section 16(b) liability, regardless of Holtzman's status as a director of Casual Male at the time of the sale.

### III. *Calculating Damages*

#### A. Recovery of Profits

Section 16(b) states that the issuer corporation can recover from an insider "any profit realized...from any purchase and sale...within any period of less than six months." 15 U.S.C. § 78p(b). Courts in

---

249 F.3d at 129 ("Although [a SEC No–Action] letter lacks any binding precedential force on the federal courts, it was not error for the district court to rely on the letter for whatever persuasive value it may have had.").

**10.** Holtzman did not sign either the Stock Option Agreement or the Consulting Agreement on behalf of Jewelcor.

the Second Circuit have interpreted this provision very broadly. *See Smolowe v. Delendo Corp.*, 136 F.2d 231 (2d. Cir. 1943) ("We must suppose that the statute was intended to be thoroughgoing, to squeeze all possible profits out of stock transactions..."); *Gratz v. Claughton*, 187 F.2d 46, 52 (2d Cir.1951) (following *Smolowe*, and explicitly reasserting its doctrine "as res integra and after independent analysis"); *Gould Investors*, 445 F.Supp. at 1155, n. 13 ("It is quite clear that the rule in this Circuit is to give a broad construction to the term 'profits realized.'"), *Schur v. Salzman*, 365 F.Supp. 725, 730 (S.D.N.Y.1973) ("'Any profit' is not limited or confined; it is all-inclusive.").

■ "In computing damages, it is well settled that the Act allows any 'sale' to be matched with any purchases within six months." *Gould Investors*, 445 F.Supp. at 1155; *accord Gratz*, 187 F.2d at 51 ("[T]he Act does not demand that the same shares should be sold which were bought. This accords with the fungible nature of shares of stock."). The Court may look for any profits realized by defendants "six months both before and after any sale." *Gratz*, 187 F.2d at 52.

■ "The computation itself involves subtracting the purchase price of the securities from the proceeds of the sale." *Gould Investors*, 445 F.Supp. at 1155. This must be done in such a way as to increase the recoverable profits to the greatest possible amount. *Gratz*, 187 F.2d at 51–52 ("When the damages are at some unascertainable amount below the upper limit and when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount."); *Feder v. Martin Marietta Corp.*, 406 F.2d 260 (2d. Cir.1969) ("Under the well-established rule, profits for § 16(b) purposes are computed by arbitrarily matching purchases with sales in order to obtain the maximum amount of profits."); *Donoghue v. Natural Microsystems Corp.*, 198 F.Supp.2d 487, 492 (S.D.N.Y.2002) ("profits are computed from the record using the 'Lowest–In, Highest–Out' method, arbitrarily matching the highest-priced sales transactions with the lowest-priced purchases containing the same number of shares.").

■ On April 18, 2002, Jewelcor sold 79,467 shares to Casual Male, at a price of $5.82 per share, for a total value of $462,498. 56.1 Statement, ¶ 15. Within six months before the sale—between November 21, 2001 and January 2, 2002—Jewelcor bought 62,951 Casual Male shares on the open market, at prices ranging from $2.24 to $3.02 per share, for a total purchase price of $149,482. *Id.* at ¶ 16. In addition, within six months after the sale—between October 3 and October 14, 2002—Jewelcor bought 25,110 Casual Males Shares, at prices ranging from $3.12 to $3.35 per share. Plnt.'s Supp. Statement, ¶ 2. The total cost of 16,516 of these shares, using the lowest purchase prices in the range, was $53,878. This figure, added to the total purchase price of the shares Jewelcor bought within six months before the sale ($149,482), brings the lowest possible total price for 79,467 purchased shares to $203,360. Subtracting this from the value of the sold shares, $462,498, brings Jewelcor's profits to $259,138.

| | |
|---|---|
| Proceeds of April 2002 sale of 79,467 shares: | $462,498 |
| Purchase price of 62,951 shares bought between November 2001—January 2002: | − $149,482 |
| Purchase price of 16,516 shares bought during October 2002: | − $ 53,878 |
| Jewelcor's profit | = $259,138 |

Thus, Jewelcor is required to pay Casual Male the sum of $259,138, which represents the profits it realized from its open market purchases of Casual Male shares

within six months before and after its sale of such shares, in violation of Section 16(b) of the Exchange Act.[11]

### B. Prejudgment Interest

 The decision of whether interest should be awarded in a particular Section 16(b) action is within the discretion of the Court. *Morales v. Freund*, 163 F.3d 763, 767 (2d Cir.1999); *Donoghue*, 198 F.Supp.2d at 492; *Gould Investors*, 445 F.Supp. at 1156. Because "Section 16(b) says nothing about interest one way or the other," the Supreme Court has held that interest should be "given in response to considerations of fairness" and "denied when its exaction would be inequitable." *Blau*, 368 U.S. at 414, 82 S.Ct. 451 (quoting *Board of County Comm'rs v. United States*, 308 U.S. 343, 353, 60 S.Ct. 285, 84 L.Ed. 313 (1939)).

In the present case, although Plaintiff alleges that Defendants have prolonged proceedings by denying liability, she concedes that she "does not believe Jewelcor to have acted with wrongful intent in entering into the short-swing transaction at issue." Plnt.'s Brief, 13. Courts are disinclined to grant interest when defendants, through liable, have not acted in bad faith. *Freund*, 163 F.3d at 767; *Schaffer v. Dickstein & Co.*, 1997 WL 292005, *1 (S.D.N.Y.1997); *Gould Investors*, 445 F.Supp. at 1156. Therefore, Plaintiff's request for prejudgment interest is denied.

### IV. *Conclusion*

For the reasons stated above, the Court grants Plaintiff's motion for summary judgment and denies Defendants' motion for summary judgment. The Court finds Defendants liable in the amount of $259,138, and denies Plaintiff's request for prejudgment interest.

The Clerk of the Court is directed to close this case. Any pending motions are moot.

SO ORDERED.

---

11. The above calculation of profits conforms with the calculations that Plaintiff suggested in her memoranda. *See* Plnt.'s Brief, 12–13; Plnt.'s Opp. and Reply, 11–12. Defendants voiced no objections to these calculations in their memoranda, although they did contend that prejudgment interest should not be awarded if liability exists. *See* Deft.s' Opp., 12–13, Deft.s' Reply, Ex. A.