RENDERED: JULY 9, 2020
TO BE PUBLISHED



### Supreme Court of Kentucky

2019-SC-000041-TG

RANDY OVERSTREET; BOBBY D. HENSON;
WILLIAM S. COOK; TIMOTHY
LONGMEYER; THOMAS ELLIOTT;
JENNIFER ELLIOTT; AND, VINCE LANG

APPELLANTS

ON TRANSFER FROM COURT OF APPEALS

V.                        CASE NO. 2019-CA-000012
FRANKLIN CIRCUIT COURT NO. 17-CI-01348
HONORABLE PHILLIP J. SHEPHERD

JEFFREY C. MAYBERRY, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
HONORABLE BRANDY O. BROWN, AS
MEMBER AND BENEFICIARY OF TRUST
FUNDS ON BEHALF OF THE KENTUCKY
RETIREMENT SYSTEMS, AND AS
TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY;
MARTHA MICHELLE MILLER, AS
MEMBER AND BENEFICIARY OF TRUST
FUNDS ON BEHALF OF THE KENTUCKY
RETIREMENT SYSTEMS, AND AS
TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY; STEVE
ROBERTS, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
TERESA STEWART, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
JASON LAINHART, AS MEMBER AND

APPELLEES

BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
DON. D. COOMER, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
BEN WYMAN, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
KKR & CO. L.P.; HENRY R. KRAVIS;
GEORGE R. ROBERTS; PRISMA CAPITAL
PARTNERS LP; PACIFIC ALTERNATIVE
ASSET MANAGEMENT COMPANY, LLC;
GIRISH REDDY; JANE BUCHAN;
BLACKSTONE GROUP, L.P.; BLACKSTONE
ALTERNATIVE ASSET MANAGEMENT
COMPANY, L.P.; STEVEN A. SCHARZMAN;
J. TOMILSON HILL; R.V. KUHNS &
ASSOCIATES, INC.; REBECCA A.
GRATSINGER; JIM VOYTKO; ICE MILLER,
LLP; CAVANAUGH MACDONALD
CONSULTING, LLC; THOMAS J.
CAVANAUGH; TODD B. GREEN; ALISA
BENNETT; GOVERNMENT FINANCE
OFFICERS ASSOCIATION; KENTUCKY
RETIREMENT SYSTEMS; DAVID PEDEN;
BRENT ALDRIDGE; T. J. CARLSON; AND,
WILLIAM A. THIELEN

AND

2019-SC-00042-TG

BRENT ALDRIDGE; T.J. CARLSON; DAVID                    APPELLANTS
PEDEN; AND, WILLIAM THIELEN

ON TRANSFER FROM COURT OF APPEALS
V.              CASE NO. 2019-CA-000016
FRANKLIN CIRCUIT COURT NO. 17-CI-01348
HONORABLE PHILLIP J. SHEPHERD

JEFFREY C. MAYBERRY AS MEMBER AND                              APPELLEES
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
HONORABLE BRANDY O. BROWN, AS
MEMBER AND BENEFICIARY OF TRUST
FUNDS ON BEHALF OF THE KENTUCKY
RETIREMENT SYSTEMS, AND AS
TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY;
MARTHA MICHELLE MILLER, AS MEMBER
AND BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
STEVE ROBERTS, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
TERESA STEWART, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
JASON LAINHART, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
DON. D. COOMER, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
BEN WYMAN, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
KKR & CO. L.P.; HENRY KRAVIS; GEORGE
ROBERTS; PRISMA CAPITAL PARTNERS
LP; PACIFIC ALTERNATIVE ASSET
MANAGEMENT COMPANY, LLC; GIRISH
REDDY; JANE BUCHAN; BLACKSTONE

GROUP, L.P.; BLACKSTONE ALTERNATIVE
ASSET MANAGEMENT COMPANY, L.P.;
STEVEN A. SCHARZMAN; J. TOMILSON
HILL; R.V. KUHNS & ASSOCIATES, INC.;
REBECCA A. GRATSINGER; JIM VOYTKO;
ICE MILLER, LLP; CAVANAUGH
MACDONALD CONSULTING, LLC; THOMAS
CAVANAUGH; TODD GREEN; ALISA
BENNETT; GOVERNMENT FINANCE
OFFICERS ASSOCIATION; KENTUCKY
RETIREMENT SYSTEMS; WILLIAM S.
COOK; RANDY OVERSTREET; TIMOTHY
LONGMEYER; BOBBY D. HENSON;
THOMAS ELLIOTT; JENNIFER ELLIOTT,
AND, VINCE LANG

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

### REVERSING AND REMANDING

To establish constitutional standing under Kentucky law, a plaintiff must demonstrate (1) an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury is redressable by a ruling favorable to the plaintiff.[1] We are asked in these consolidated appeals to determine whether eight members of the Kentucky Retirement System's (KRS's) defined-benefit retirement plan have standing to bring claims for alleged funding losses sustained by the KRS plan against certain former KRS trustees and officers as well as private-investment advisors and hedge funds and their principals. Because we conclude that Plaintiffs do not have an injury in fact that is concrete or particularized, they

---

[1] *Commonwealth Cabinet for Health & Family Servs., Dep't for Medicaid Servs. v. Sexton by & through Appalachian Reg'l Healthcare, Inc.*, 566 S.W.3d 185, 196 (Ky. 2018).

4

do not have the requisite standing to bring their claims. Accordingly, we reverse the circuit court's order and remand to the circuit court with direction to dismiss the complaint.

## I. BACKGROUND.

Plaintiffs are eight public employees—current and retired—who are members of KRS. Because Plaintiffs began participation in KRS before January 1, 2014, their retirement plan is a defined-benefit plan under which retirees receive a fixed payment each month. Plaintiffs do not claim to have had their vested or expected retirement benefits reduced or otherwise made unavailable to them, and they are legally and contractually entitled to receive those payments, once vested, for the rest of their lives.

Plaintiffs brought this action in circuit court against eleven KRS trustees and officers in their individual capacity and against third parties who did business with KRS, including actuarial and investment advisors, hedge-fund sellers, and their executives.[2]

Plaintiffs allege that between 2011 and 2016 Defendants knew that KRS faced an appreciable risk of running out of plan assets but concealed the true state of affairs from KRS members and the public. Instead, Plaintiffs allege, the KRS trustees and officers attempted to "recklessly gamble" their way out of the actuarial shortfall by investing $1.5 billion of KRS plan assets in high-risk "fund-of-hedge-fund" products offered by the defendant hedge-fund sellers.[3]

---

[2] We refer to these parties collectively as Defendants.

[3] Plaintiffs refer to these investment vehicles as "Black Boxes."

5

According to Plaintiffs, these investments ultimately lost over $100 million by 2018 and further accumulated fees "expected to measure in the hundreds of millions of dollars." These losses, according to Plaintiffs, contributed to what is now a $25 billion funding shortfall in the KRS general pool of assets.

As a result, Plaintiffs brought claims against the trustees and officers for breach of certain common-law and statutory duties owed to KRS and its members. Plaintiffs also asserted claims for breach of fiduciary duties against the advisors and hedge-fund sellers and their principals as well as claims for aiding and abetting the breaches of the trustees and officers. And Plaintiffs brought a claim against all Defendants for engaging in a joint enterprise or civil conspiracy to breach fiduciary duties. Plaintiffs sought monetary damages for the shortfall suffered by KRS because of the allegedly risky investments and consequent use of taxpayer funds to cover that shortfall as well as disgorgement of allegedly excessive and unjustified fees from the hedge-fund sellers. They also sought declaratory relief and injunctive relief to remove one of the trustee defendants from the KRS Board, to prohibit him from serving on the Investment Committee, and directing that any hedge-fund sellers working inside KRS be removed. Plaintiffs assert that any monetary recovery is to go to the KRS plan. But, not to be missed, Plaintiffs also seek attorneys' fees and an "incentive fee" for each of the named KRS members.

After Plaintiffs filed this action, KRS formed an "independent special litigation committee of the Board of Trustees" to investigate Plaintiffs' claims and consider whether to join the action. In a Joint Notice filed with Plaintiffs in

6

the circuit court, KRS explained that it ultimately declined to join the action or itself pursue the claims but nevertheless endorsed the Plaintiffs' "pursuit of these claims on a derivative basis on KRS's behalf." And if the Plaintiffs' claims are dismissed on standing grounds, KRS explained, it reserved the right later to pursue the claims itself. In addition, Plaintiffs also provided the Attorney General an advance copy of their complaint before filing, but he declined to join the suit.

In February of 2018, Defendants moved to dismiss Plaintiffs' claims for lack of constitutional standing and, for some defendants, on immunity grounds. The circuit court denied the motion, finding, among other things, that Plaintiffs had standing to bring their claims.

From the circuit court's order, the KRS trustee and officer defendants each filed notices of interlocutory appeal in which they challenge the circuit court's rulings on sovereign immunity and constitutional standing. This court accepted transfer of those appeals and consolidated them. Those consolidated appeals make up the present case before this Court.

Meanwhile, in January of 2019, a subset of Defendants also filed an original action in the Court of Appeals seeking a writ of prohibition claiming the circuit court was acting outside of its subject-matter jurisdiction. In April 2019, the Court of Appeals granted the writ of prohibition, finding that Plaintiffs lacked standing, and the Plaintiffs appealed that decision to this

Court.[4] We heard oral argument in all three cases on the same day, and now render this opinion and orders adjudicating those cases simultaneously.

## II. ANALYSIS.

The only issues before this Court are whether the Plaintiffs have an injury in fact sufficient to support constitutional standing as required by our recent case, *Commonwealth Cabinet for Health & Family Servs., Dep't for Medicaid Servs. v. Sexton by & through Appalachian Reg'l Healthcare, Inc.,*[5] (*Sexton*), and whether the trustee and officer defendants are entitled to immunity. Because we find that the Plaintiffs lack an injury in fact sufficient to support constitutional standing, we dismiss this case and do not reach the immunity issue.[6]

### A. *This Court may address constitutional standing in an interlocutory appeal that is properly before us on independent grounds.*

We first clarify this Court's authority to address the issue of constitutional standing in a procedurally proper interlocutory appeal. These cases are before us at this juncture as interlocutory appeals from the same circuit court order denying Defendants' motion to dismiss on standing and immunity grounds.

While "a trial court's ruling on the issue of constitutional standing, in and of itself, does not give rise to an immediate right to an appeal, i.e. an

---

[4] We refer to that case herein as the "Writ Case." In an Order of the Court rendered today, we dismiss the Writ Case as moot.

[5] 566 S.W.3d 185, 195 (Ky. 2018).

[6] Our dismissal of this case renders the Writ Case moot.

interlocutory appeal[,]" this Court has the authority to address constitutional

standing whenever a facially valid and procedurally proper interlocutory appeal

is before it.[7] In this case, the facially valid and procedurally proper

interlocutory-appeal issue before us is whether the doctrine of qualified official

immunity bars Plaintiffs' claims.[8] As such, we address Defendants'

constitutional standing arguments,[9] which we review de novo.[10]

### B. Plaintiffs lack an injury in fact sufficient to support constitutional standing.

To sue in a Kentucky court the plaintiff must have the requisite

constitutional standing, which is defined by three requirements: (1) injury, (2)

---

[7] *Sexton*, 566 S.W.3d at 191–92 (holding that this Court has authority to address constitutional standing on a facially valid and procedurally proper interlocutory appeal of a lower court's ruling on sovereign immunity).

[8] *See Baker v. Fields*, 543 S.W.3d 575 (Ky. 2018) (a ruling on an immunity defense is an appealable issue by interlocutory appeal); *see also Sexton*, 566 S.W.3d at 191–92 (recognizing the same).

[9] The KRS defendants argue both that Plaintiffs lack constitutional standing and that they are immune from suit in their Appellant Briefs. Curiously, however, Plaintiffs' Appellee Brief makes no substantive argument on the constitutional-standing issue but rather dedicates all 50 pages to the immunity issue. Instead, Plaintiffs "rely on their briefs in the [corresponding] writ appeal for a complete discussion regarding standing . . ." and provide a conclusory summary of the arguments contained therein. Because incorporating by reference additional pages of argument would presumably violate the 50-page brief requirement contained in CR 76.12(4)(b)(ii), we would normally be apt to strike those arguments. But because of the unique nature of this appeal—and, ultimately, because we find the Plaintiffs lack standing—we address each of the constitutional-standing arguments contained in the Plaintiffs' Writ Appeal brief.

[10] *Nash v. Campbell Cty. Fiscal Ct.*, 345 S.W.3d 811, 816 (Ky. 2011) ("Issues of law are reviewed de novo by a reviewing court.")

causation, and (3) redressability.[11]

To establish the first requirement, "an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"[12] "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way."[13] This means the plaintiff "personally has suffered some actual or threatened injury."[14] For an injury to be concrete, it must "actually exist."[15] And while an injury may be threatened or imminent, the concept of imminence "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for [constitutional standing] purposes—that the injury is *certainly impending*."[16] Thus, the United States Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact' and that '[a]llegations of *possible* future injury' are not sufficient."[17]

---

[11] *Sexton*, 566 S.W.3d at 196.

[12] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2010) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, ——, 130 S.Ct. 2743, 2752, 177 L.Ed.2d 461 (2010)).

[13] *Spokeo, Inc. v. Robins*, 136 S. Ct 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560 n. 1).

[14] *United States v. Richardson*, 418 U.S. 166, 177 (1974).

[15] *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560 n. 1).

[16] *Clapper*, 568 U.S. at 409 (quoting *Lujan*, at 565, n. 2) (internal quotations marks omitted and emphasis in original).

[17] *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in original). The *Clapper* court also noted by footnote that "[o]ur cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a "substantial risk" that the harm will occur, which may prompt plaintiffs to reasonably incur costs

If Plaintiffs here had not received their vested monthly pension benefits, they would certainly have the requisite injury in fact to support standing.[18] But Plaintiffs at this point *have* received and will continue to receive all their monthly pension benefits. To demonstrate standing to bring their claims, Plaintiffs assert three alternative arguments: (1) they have standing as representatives of the KRS plan, (2) they have standing as common-law beneficiaries of a trust, and (3) they have standing as taxpayers of the Commonwealth.

And although not briefed to this Court, Plaintiffs advanced at oral argument and in a subsequent motion filed before this Court that they *themselves* have a direct injury because the Defendants' collective actions substantially increased the risk that their benefits will be denied in the future. We start with Plaintiff's direct-injury argument and address each in turn.

*i. Direct Injury to Plaintiffs.*

We note first that any loss to KRS plan assets does not directly confer an injury to the Plaintiffs because they are members of a defined-benefit plan rather than a defined-contribution plan. "In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment

_____

to mitigate or avoid that harm." *Id.* at 414 n. 5. There is no allegation that Plaintiffs are required to reasonably incur costs to mitigate the risk that their benefits will be reduced or made unavailable to them in the future.

[18] *See Thole v. U.S. Bank,* 140 S. Ct. 1615, 1619 (2020) ("If Thole and Smith had not received their vested pension benefits, they would of course have Article III standing to sue . . . .").

11

decisions."[19] In a defined-contribution plan, by contrast, "the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions."[20] So, any alleged mismanagement of the KRS plan has no direct bearing on whether the KRS-member Plaintiffs in this case will receive their vested monthly retirement payments.[21]

Plaintiffs instead assert that the collective mismanagement of the KRS plan confers an injury in fact personal to themselves because the resulting decrease in plan assets substantially increased the risk that their retirement benefits will be denied in the future. Specifically, Plaintiffs assert that the imprudent investment decisions in question resulted in hundreds of millions of dollars in losses to the plan assets thereby placing at significant risk the solvency of the KRS fund.

But relying on any increased risk of not receiving pension benefits in the future poses a problem in this case: as KRS beneficiaries, Plaintiffs' retirement

---

[19] *Thole*, 140 S. Ct. at 1618. *See also Evans v. Akers*, 534 F.3d 65, 71 n. 5 (1st Cir. 2008) (citing *LaRue v. DeWolff, Boberg, & Assocs., Inc.*, 552 U.S. 248, 255–56 (2008)) ("In contrast with a defined contribution plan, where the amount of benefits is directly related to the investment income earned in an individual account, the investment performance of the portfolio held by a defined benefit plan has no effect on the level of benefits to which a participant is entitled, provided that the plan remains solvent.").

[20] *Id.* (citing *Beck v. PACE Int'l Union*, 551 U.S. 96, 98 (2007); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439–40 (1999)).

[21] Plaintiffs' counsel conceded at oral argument that none of the Plaintiffs are members of the KRS "Hybrid Cash Balance Plan," which has characteristics of both a defined-benefit plan and a defined-contribution plan. That plan became available to members who began participation with KRS on or after January 1, 2014.

12

benefits are part of a statutorily declared "inviolable contract" between KRS members and the Commonwealth.[22] Should KRS become so severely underfunded that it runs out of assets and terminates, the Plaintiffs are still entitled to their pension benefits under their inviolable contract with the Commonwealth. And even before the risk of plan termination is realized, the Commonwealth has the authority to increase its own contribution to the KRS plan to make up any actuarial shortfall in its assets. In essence, then, the full faith and credit of the Commonwealth serves as a backstop for Plaintiffs' pension benefits even in the event that severe plan mismanagement renders KRS insolvent.

In the context of private ERISA defined-benefit pension plans, similar increased-risk standing arguments have been rejected as too speculative largely because even mismanagement that results in severe underfunding still

---

[22] *See Jones v. Bd. of Trs. of Ky. Ret. Sys.*, 910 S.W.2d 710, 713 (Ky. 1995) (recognizing that "the retirement savings system has created an inviolable contract between KERS members and the Commonwealth . . . "); *See also* KRS 61.692(1), which provides the following:

(1) For members who begin participating in the Kentucky Employees Retirement System prior to January 1, 2014, it is hereby declared that in consideration of the contributions by the members and in further consideration of benefits received by the state from the member's employment, KRS 61.510 to 61.705 shall constitute an inviolable contract of the Commonwealth, and the benefits provided therein shall not be subject to reduction or impairment by alteration, amendment, or repeal, except:

(a) As provided in KRS 6.696; and

(b) The General Assembly reserves the right to amend, reduce, or suspend any legislative changes to the provisions of KRS 61.510 to 61.705 that become effective on or after July 1, 2018.

13

requires the realization of several additional risks beyond plan termination before beneficiaries are denied their benefits. For example, in *Lee v. Verizon Communications, Inc.*,[23] the Fifth Circuit found plan participants in a private-employer defined-benefit plan lacked an injury in fact to bring a claim against plan administrators for fiduciary misconduct.[24] The plan participants had argued, in part, that they were directly harmed from the alleged plan mismanagement because the transactions in question had left the plan "in a far less stable financial condition and underfunded by almost $2 billion or only about 66% actuarially funded."[25]

But the court found this risk-based theory too speculative to support standing largely because "prior to default [in a private-employer defined-benefit plan] 'the employer typically bears the entire investment risk and—short of the consequences of plan termination—must cover any underfunding as the result of the shortfall that may occur from the plan's investments.'"[26] And even in the event the employer is unable to cover the underfunding, "the impact on participants is not certain since the PBGC[27] provides statutorily-defined protection of participants' benefits."[28] Instead, the court explained, other

---

[23] 837 F.3d 523 (5th Cir. 2016)

[24] *Id.* at 545–48.

[25] *Id.* at 546.

[26] *Id.* at 545 (quoting *Hughes Aircraft Co.*, 525 U.S. at 439).

[27] The Pension Benefit Guaranty Corporation serves as an insurance for plan termination, into which private defined-benefit plans are required to pay premiums each year. *See LaRue*, 552 U.S. at 256.

[28] *Lee*, 837 F.3d at 545.

14

federal circuit courts considering the degree to which the impact of fiduciary misconduct must be realized in order to establish standing had concluded that "constitutional standing for defined-benefit plan participants requires imminent risk of default by the plan, *such that participant's benefits are adversely affected.*"[29] As such, it was irrelevant whether the plan was under- or overfunded because the risk to the participants' benefits depended on the realization of several additional risks—that the employer would be unable to cover the shortfall or that the PBGC would be unable to provide the benefits— which "collectively render the injury too speculative to support standing."[30] Without credibly alleging impending plan termination *and* an inability of the employer to cover the shortfall, the participants' "allegations that the plan was underfunded, and less financially stable, merely increases the relative likelihood that [the employer] will have to cover a shortfall"—not the likelihood that the participants will not receive their benefits.[31]

A number of federal circuits have reached similar conclusions,[32] which we note is consistent with the United States Supreme Court's view that

[29] *Id.* at 546 (citing *David v. Alphin,* 704 F.3d 327, 338 (4th Cir. 2013); *Harley v. Minn. Mining & Mfg. Co.,* 284 F.3d 901, 906 (8th Cir. 2002), *Perelman v. Perelman,* 919 F. Supp. 2d 512, 517–520 (E.D. Pa. 2013), aff'd, 793 F.3d 368 (3d Cir. 2015)) (emphasis added).

[30] *Id.* at 546.

[31] *Id.*

[32] *See, e.g., Alphin,* 704 F.3d at 338 (finding "the alleged risk to be insufficiently 'concrete and particularized' to constitute an injury-in-fact for [constitutional standing] standing purposes. If the Plan becomes underfunded, the [employer] will be required to make additional contributions. If the [employer] is unable to do so because of insolvency, participants' vested benefits are guaranteed by the PBGC up to a statutory minimum[]").

15

"threatened injury must be *certainly impending* to constitute injury in fact."[33] But Plaintiffs assert in a motion before this Court that the Supreme Court's recent decision in *Thole v. U.S. Bank*[34] "explicitly left undisturbed the rule expressed in *LaRue v. DeWolff, Boberg & Associates, Inc.*[35] that standing *does* exist where 'misconduct by the administrators of a defined benefit plan . . . creates or enhances the risk of default by the entire plan.'"[36] But neither *Thole* nor *LaRue* stands for that proposition.

*Thole* expressly left unaddressed this issue because "the plaintiffs' complaint did not plausibly and clearly claim that the alleged mismanagement of the plan substantially increased the risk that the plan *and the employer* would fail and be unable to pay the plaintiffs' future pension obligations."[37] The Court stated that "a bare allegation of plan underfunding does not itself demonstrate a substantially increased risk that the plan *and the employer*

---

[33] *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in original and internal quotations marks omitted).

[34] 140 S. Ct. 1615.

[35] 552 U.S. at 254–56.

[36] Plaintiffs cite to *City of Louisville v. Stock Yards Bank & Trust Co.*, 843 S.W.2d 327 (Ky. 1992), as consistent with this proposition. But that case dealt with the ability of the City of Louisville, not beneficiaries, to sue for mismanagement of the Policeman's Retirement Fund of the City of Louisville. *Id.* at 328. The Court held that the City had the requisite interest to sue because not only had the City "made direct payments to the fund to maintain its fiscal soundness, it also has the additional duty, in the interest of sound public policy, to guarantee that active police officers have a dependable pension plan, one free of waste and mismanagement." *Id.* at 329. By contrast, the Court stated that "while appellees concede that fund beneficiaries may have standing, these individuals would have little motivation to bring suit secure in the knowledge that their pension benefits are guaranteed by the taxpayers of the City of Louisville." *Id.* This case deals with the standing of the latter—beneficiaries of a defined-benefit plan, not its member employers.

[37] *Thole*, 140 S. Ct. at 1622 (emphasis added).

16

*would both fail.*[38] The Court did, however, suggest in a footnote that the plaintiffs might not even have standing in the event both the plan *and* employer were to fail because, in that scenario, "the PGBC would be required to pay these two plaintiffs all of their vested pension benefits in full."[39]

While *LaRue* stated that "misconduct by the administrators of a defined benefit plan will not affect entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan," it did so in passing, only to illustrate that the plaintiffs in that case—members of a defined-contribution plan—did not need to show that the solvency of the entire plan was threatened in order for their benefits to be reduced.[40] But even still, the *LaRue* court's statement is consistent with the *Lee* court's rule that an injury in fact will not result unless it can be shown, at least, that plan termination is imminent, and the *employer* will not be able to cover the shortfall in the event of plan default. And even further, the *LaRue* court noted immediately after this statement that the risk of plan default is what "prompted Congress to require defined benefit plans (but not defined contribution plans) to satisfy complex minimum funding requirements, and to make premium payments to the Pension Benefit Guaranty Corporation for plan termination insurance."[41] So it is not clear that even the *LaRue* court thought an injury in fact existed for defined-benefit

---

[38] *Id.* (emphasis added).
[39] *Id.* at n. 2.
[40] 552 U.S. at 255.
[41] *Id.*

beneficiaries in the event of plan and employer default because of the effect of the PBGC.[42]

But in any case, even assuming the Supreme Court would have found an injury in fact had the plaintiffs in *Thole* alleged that the employer was unable to cover any shortfall in the plan, that holding would not apply here. Plaintiffs have alleged that KRS is severely underfunded and that, at least in part, plan mismanagement is to blame. But, similar to the plaintiffs in *Lee*, Plaintiffs in this case have not alleged that the Commonwealth will be unable to cover the shortfall by increasing its contribution to the system or that, in the event of plan termination, the Commonwealth would be unable to pick up the tab directly. In sum, Plaintiffs have only alleged that the plan mismanagement increases the relative likelihood that the Commonwealth—an entity with taxing authority and the inability to avoid its obligations through bankruptcy[43]—will eventually have to fund the KRS plan's actuarial shortfall or pay Plaintiffs their benefits directly. Such an allegation is too speculative and hypothetical to confer standing for defined-benefit beneficiaries.

Relatedly, Plaintiffs also argue in passing that the statutory scheme grants to KRS participants a statutory right to prudent plan management and that they suffer a cognizable injury through invasion of that right by the alleged fiduciary misconduct. But this theory of standing has also repeatedly been

---

[42] It is also worth noting that *Thole* cites the standing discussion in *Lee*, 837 F.3d at 545–46, as analogous authority to the risk-based standing theory.

[43] Under the Bankruptcy Act, states are not persons eligible to file for bankruptcy protection. 11 U.S.C. § 109.

rejected by federal circuits in the context of ERISA as conflating the concepts of statutory and constitutional standing.[44] That is, even if the KRS scheme grants to Plaintiffs a statutory right to have their plan managed in accordance with certain fiduciary standards, Plaintiffs must still themselves show a constitutional injury in fact to bring their claims. The Plaintiffs themselves do not have such an injury, so they may not bring their claims under this theory.

*ii. Representative Standing.*

While the alleged fiduciary misconduct is not sufficient to support a direct injury in fact on the part of Plaintiffs, they alternatively assert standing in a *representational* or *derivative* capacity on behalf of KRS and the Commonwealth.[45] While the plan may have suffered a loss of assets as a result of alleged mismanagement, such an injury is insufficient to confer standing on the part of the Plaintiffs here.

Importantly, the requirement of an injury in fact is a hard floor of our courts' jurisdiction that cannot be set aside by courts or legislatures.[46] So in

---

[44] *See Lee*, 837 F.3d at 546 (rejecting argument that plan beneficiaries' statutory right to proper plan management sufficed for Article III standing where participants did not themselves have a concrete stake in the suit and reiterating that the *Lujan* Court "clarified that a legislative creating of rights does not eliminate the injury requirement for a party seeking review" (citing *Lujan*, 504 U.S. at 578)); *see also Alphin*, 704 F.3d at 338 (rejecting same argument as a "non-starter" for conflating statutory and constitutional standing).

[45] In fact, Plaintiffs First Amended Complaint conceded that they did not, themselves, have an injury in fact but were instead bringing their claims on behalf of KRS and the Commonwealth.

[46] *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) ("[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."). "Article III jurisdiction" refers to jurisdiction of federal courts under Article of the United States Constitution. Because we have interpreted the Kentucky Constitution to have the same justiciability requirements as the federal

19

order to claim 'the interests of others, the litigants themselves still must have suffered an injury in fact, thus giving' them 'a sufficiently concrete interest in the outcome of the issue in dispute."[47] As such, the Supreme Court in *Thole* recently rejected this exact argument in the context of participants in an ERISA defined-benefit plan, who did not themselves have an injury in fact, asserting claims on behalf of the plan.[48] Similarly, as we concluded above, the Plaintiffs do not themselves have an injury in fact, so they cannot also assert their claims on behalf of the plan.

Plaintiffs analogize their representative claim to corporate derivative suits in which, they argue, shareholders need not show an injury personal to themselves. But that argument ignores the fact that plaintiffs in a shareholder suit have a continuing personal interest in the litigation because of their status as shareholders. The requirement that derivative plaintiffs maintain ownership of their shares in the corporation throughout the pendency of litigation is codified in both Federal Rule of Civil Procedure 23.1 and, in Kentucky, KRS 271B.7–400(1). While Plaintiffs assert this requirement serves only a prudential standing purpose, we believe it has constitutional-standing implications as well.

---

constitution, *see Sexton*, 566 S.W.3d at 196–97 (interpreting Ky. Const. § 112 and adopting the federal test for constitutional standing), this rule applies to courts of the Commonwealth as well.

[47] *Thole*, 140 S. Ct. at 1620 (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013)).

[48] *See id.* (holding plaintiff-beneficiaries of a defined-benefit plan who themselves lack a cognizable injury do not have standing to sue "as representatives of the plan itself").

In *Gollust v. Mendell*,[49] the Supreme Court considered whether a shareholder plaintiff bringing a derivative claim under § 16(b) of the Securities Exchange Act of 1934 had standing even after losing ownership of his shares in the defendant company during the litigation.[50] Section 16(b) imposes strict liability on "insider" owners of more than ten percent of a corporation's listed stock for any profits realized from the purchase and sale of stock occurring within a six-month period.[51] The statute authorizes both issuers and "owner[s] of any security of the issuer" to bring suit on behalf of the issuer against the "insider" to recover short-swing profits—with any recovery going back to the corporation.[52]

The plaintiff in *Gollust*, a shareholder in the defendant corporation, brought suit on behalf of the corporation against an "insider" for short-swing trade profits but lost ownership of his shares in the corporation during the suit.[53] In determining whether the plaintiff had standing to continue, the Court first concluded that neither the text of the statute nor its legislative history required a shareholder plaintiff to maintain ownership of the stock throughout the entire litigation.[54] But the Court construed the statute to require the shareholder plaintiff to maintain ownership of the shares throughout the entire

---

[49] 501 U.S. 115 (1991).

[50] *Id.* at 117–19.

[51] *Id.* at 117.

[52] *Id.*

[53] *Id.* at 118–19.

[54] *Id.* at 124.

21

case because such a construction would both further the purpose of the statute by ensuring plaintiffs have an incentive to litigate vigorously on behalf of the corporation *and* would avoid the "serious constitutional question that would arise" from allowing a non-shareholder plaintiff to continue prosecution of the case.[55] Explaining its justification for construing the statute to have a continuous ownership requirement, the *Gollust* Court stated the following:

> Congress must, indeed, have assumed any plaintiff would maintain some continuing financial stake in the litigation for a further reason as well. For if a security holder were allowed to maintain a § 16(b) action after he had lost any financial interest in its outcome, there would be serious constitutional doubt whether that plaintiff could demonstrate the standing required by Article III's case-or-controversy limitation on federal court jurisdiction.[56] Although "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules,"[57] . . . "Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself."[58] Moreover, the plaintiff must maintain a "personal stake" in the outcome of the litigation throughout its course.[59]

> Hence, we have no difficulty concluding that, in the enactment of § 16(b), Congress understood and intended that, throughout the period of his participation, a plaintiff authorized to sue insiders on behalf of an issuer would have some continuing financial interest in the outcome of the litigation, both for the sake of furthering the statute's remedial purposes by ensuring that enforcing parties

---

[55] *Id.* at 152–26.

[56] *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (Article III requires "the party requesting standing [to allege] 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues' ") (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)); *see also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982).

[57] *Warth v. Seldin*, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

[58] *Id.*

[59] *See United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395–397 (1980).

maintain the incentive to litigate vigorously, and to avoid the serious constitutional question that would arise from a plaintiff's loss of all financial interest in the outcome of the litigation he had begun.[60][61]

As such, even though the Court recognized ownership of an issuer's security is only a "modest financial stake" in the outcome of a derivative suit, the Court nonetheless views it as necessary to satisfy constitutional standing. We take from this that while the requirement that a shareholder maintain ownership of the shares throughout the course of litigation may serve some "prudential standing" purpose in that it ensures the plaintiff has an incentive to litigate the case vigorously and compatibly with the corporation's interests, it *also* serves the purpose of satisfying the injury-in-fact requirement of constitutional standing. And perhaps more importantly, the Court in *Thole* cited to *Gollust* as authority "suggesting that shareholder must 'maintain some continuing financial stake in the litigation' in order to have Article III standing to bring an insider trading suit on behalf of the corporation."[62]

Further, Plaintiffs argue that our recent decision in *Sexton*[63] allows representative suits as long as an injury can be shown on behalf of the entity or person being represented. But *Sexton* did not so fundamentally change the

---

[60] *See Crowell v. Benson*, 285 U.S. 22, 62, 52 S. Ct. 285, 296, 76 L. Ed. 598 (1932) ("When the validity of an act of Congress is drawn in question, and even if a serious doubt of constitutionality is raised, . . . this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided"); *see also Public Citizen v. Department of Justice*, 491 U.S. 440, 465–466 (1989); *id.*, at 481, 109 S. Ct. at 2580 (Kenndy, J., concurring in judgment).

[61] *Gollust*, 501 U.S. at 124–25.

[62] *Thole*, 140 S. Ct. at 1620.

[63] 566 S.W.3d at 195.

bedrock standing requirement that litigants themselves still must have suffered an injury in fact in order to claim the interests of others.

In *Sexton*, the plaintiff, Lettie Sexton, received medical care from a non-party hospital, Appalachian Regional Healthcare (ARH).[64] Because Sexton was a Medicaid beneficiary, ARH received reimbursement for part, but not all, of the cost of Sexton's care from Coventry Health and Life Insurance, a managed-care provider.[65] Specifically, Coventry had reimbursed ARH for the first 24 hours of Sexton's stay but not an extended 15-hour stay for a cardiology consultation.[66]

ARH, purporting to act as Sexton's representative, sought review of Coventry's denial of reimbursement, first administratively and then in a circuit court appeal of the administrative denial.[67] Importantly, Sexton was the named plaintiff in the lawsuit, even though ARH was seeking reimbursement for its claims associated with Sexton's 15-hour cardiology consult.[68]

After formally adopting the federal *Lujan* test, we held that Sexton lacked constitutional standing to bring the claim because she had not suffered an injury in fact.[69] And because Sexton—not ARH—was the named plaintiff in the case, we explained that it was Sexton's injury that mattered for purposes of constitutional standing:

---

[64] *Id.* at 188.
[65] *Id.*
[66] *Id.*
[67] *Id.* at 188–89.
[68] *Id.* at 189.
[69] *Id.* at 196–99.

> Simply stated, Sexton, by and through her authorized
> representative, ARH, lacks the requisite standing to sue in this
> case. We emphasize the crucial determinative fact—because
> Sexton, not ARH, is the true plaintiff in this case, we must examine
> the standing requirement through the lens of Sexton's, not ARH's,
> purported satisfaction.[70]

Plaintiffs now attempt to distort our holding in Sexton by asserting that the injury of the named plaintiff is irrelevant when that party is asserting the injury of another. Plaintiffs argue that because we analyzed standing through the lens of the "true plaintiff," Sexton, even though ARH was the entity asserting her claim, we must similarly analyze standing in this case from the perspective of KRS.

This misses the point. We identified Sexton as the "true plaintiff" and analyzed standing from her perspective not because ARH was attempting to assert her rights, but *because she was the plaintiff*. In this way, Sexton did not in any way change the *Lujan* constitutional analysis—we still require the actual plaintiff named in the lawsuit to show his or her own, particularized injury. Analogizing to this case, we must also analyze standing through the lens of the named plaintiffs' purported satisfaction. And the named plaintiffs are pension beneficiaries who cannot themselves show an injury in fact. As such, our decision in *Sexton* provides no support to Plaintiffs here.

---

[70] *Id.* at 197.

25

Relatedly, Plaintiffs argue they are statutorily authorized to bring their claims on behalf of KRS and the Commonwealth under KRS 61.645.[71] But, again, even if that statute provides the authorization Plaintiffs claim, they must still show a concrete stake in the suit sufficient to constitute an injury in fact. This argument again conflates the concepts of constitutional and statutory standing, "and we decline to undermine this distinction by recognizing the latter as conferring the former."[72] This point is buttressed by the fact that ERISA participants are unquestionably authorized to bring suits on behalf of the plan for fiduciary misconduct under the ERISA enforcement provision, § 502(a)(2),[73] but courts repeatedly dismiss suits brought under that provision because the participants failed to show an injury particular to themselves.[74] And, for the same reason, Plaintiff's contention that their ability to sue on behalf of KRS was "both conceded and endorsed" by KRS in the Joint Notice

---

[71] Because Plaintiffs lack an injury in fact sufficient to confer constitutional standing, we express no opinion on whether KRS 61.645 provides to KRS beneficiaries a statutory right—expressly or implicitly—to bring claims on behalf of the plan.

[72] *Lee*, 837 F.3d at 546.

[73] § 502(a)(2) authorizes ERISA pension beneficiaries to bring suit on behalf of the plan, but all relief must go to the plan itself. *Alphin*, 704 F.3d at 332 (citing *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608 (6th Cir. 2007)).

[74] *See Thole*, 140 S. Ct. at 1620 ("[Participants] stress that ERISA affords the Secretary of Labor, fiduciaries, beneficiaries, and participants—including participants in a defined-benefit plan—a general cause of action to sure for restoration of plan losses and other equitable relief. See ERISA §§ 502(a)(2), (3), . . . . But the cause of action does not affect the Article III analysis."); *see also Lee*, 837 F.3d at 544 ("This dispute centers not on whether [plaintiff has] statutory standing under § 502, but instead whether he has constitutional standing under Article III."); *David*, 704 F.3d at 343 ("It is undisputed that Appellants have statutory standing to assert claims against Appellees on behalf of the Pension Plan under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). However, appellants asserting ERISA claims must also have constitutional standing under Article III, U.S. Const. art. III, § 2.").

has no effect on Plaintiffs' ability to show an injury in fact sufficient to support constitutional standing.[75]

### iii. Standing as Trust Beneficiaries.

Plaintiffs also argue that they have standing to pursue their claims as beneficiaries of a trust based on common-law trust principles. Specifically, Plaintiffs assert that the Restatement (Third) of Trusts provides that a beneficiary of a trust can sue a third party when the trustees cannot or will not do so, to the detriment of the beneficiary's interest. And they point to language in the KRS statutory scheme as recognizing that funds administered by KRS are "trust funds" and that the participants should similarly be treated as trust beneficiaries.[76]

---

[75] Also, while not argued by the Plaintiffs, we note that KRS 61.645 does not effect an *assignment or partial assignment* of claims. Nowhere in that statute is a beneficiary given the right to collect proceeds from a lawsuit on behalf of KRS, and the Joint Notice from Kentucky lawmakers makes no such claim. This fact alone distinguishes this case from both *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269 (2008), and *Vermont Agency of Natural Res. v. U.S. ex rel Stevens*, 529 U.S. 765 (2000); two cases often cited by plaintiffs bringing representative claims under ERISA but relied on a statutory assignment of claims to satisfy the injury-in-fact requirement on the part of the representative plaintiff. See *Vermont Agency*, 529 U.S. at 773; *Sprint*, 554 U.S. at 286.

[76] *See* KRS 61.515(2) ("A fund, called the "Kentucky Employees Retirement Fund," which shall consist of all the assets of the system as set forth in KRS 61.570 to 61.585. All assets received in the fund *shall be deemed trust funds* to be held and applied solely as provided in KRS 61.510 to 61.705." (emphasis added)). We note that ERISA contains similar trust language: "all assets of an employee benefit plan shall be held in trust by one or more trustees" and "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. §§ 1103(a), (c)(1); *see also* § 1104(a)(1).

27

But this argument also has squarely been rejected in the context of ERISA plans by federal circuits[77] and, recently, the Supreme Court, because participants in a defined-benefit plan possess no equitable or property interest in the plan assets:

> The basic flaw in the plaintiffs' trust-based theory of standing is that the participants in a defined-benefit plan are not similarly situated to the beneficiaries of a private trust or to the participants in a defined-contribution plan. See *Varity Corp. v. Howe*, 516 U.S. 489, 497, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (trust law informs but does not control interpretation of ERISA). In the private trust context, the value of the trust property and the ultimate amount of money received by the beneficiaries will typically depend on how well the trust is managed, so every penny of gain or loss is at the beneficiaries' risk. By contrast, a defined-benefit plan is more in the nature of a contract. The plan participants' benefits are fixed and will not change, regardless of how well or poorly the plan is managed. The benefits paid to the participants in a defined-benefit plan are not tied to the value of the plan. Moreover, the employer, not plan participants, receives any surplus left over after all of the benefits are paid; the employer, not plan participants, is on the hook for plan shortfalls. See *Beck*, 551 U.S. at 98–99, 127 S.Ct. 2310. As this Court has stated before, plan participants possess no equitable or property interest in the plan. *See Hughes Aircraft Co.*, 525 U.S. at 439–441, 119 S.Ct. 755; *see also LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 254–256, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008). The trust-law analogy therefore does not fit this case and does not support Article III standing for plaintiffs who allege mismanagement of a defined-benefit plan.[78]

---

[77] *See, e.g., Duncan v. Muzyn*, 885 F.3d 422, 429 (6th Cir. 2018) ("A discretionary [trust] beneficiary has an equitable interest in the trust corpus, . . . but Plaintiffs identify nothing in the Plan's rules that gives members any interest in the savings account. Rather, Plaintiffs have an interest solely in their defined benefits, not in the 'general pool' of Plan assets." (citing *Hughes Aircraft Co.*, 525 U.S. at 439–40, 119 S.Ct. 755).

[78] *Thole*, 140 S.Ct. at 1619–20.

Similarly, Plaintiffs' benefits in this case are fixed and will not fluctuate based on the value of the KRS assets. And, moreover, Plaintiffs are not entitled to any surplus left over in the KRS fund, and the Commonwealth, not the Plaintiffs, is on the hook for plan shortfalls. Plaintiffs have identified nothing giving them an interest in the general pool of KRS assets, and we have previously stated that KRS beneficiaries' rights are, in essence, only "the receipt of promised funds."[79] As such, common-law trust principles also do not provide a viable theory of standing to Plaintiffs in this case.

But Plaintiffs also argue that we should adopt Section 107(2)(b) of the Restatement (Third) of Trusts, which allows a trust beneficiary to "maintain a proceeding against a third party on behalf of the trust and its beneficiaries only if . . . the trustee is unable, unavailable, unsuitable, or improperly failing to protect the beneficiary's interest." But that provision would not be applicable in this case, as beneficiaries of a defined-benefit pension plan, unlike beneficiaries of a private trust, possess no equitable interest in the plan assets, as the value

---

[79] *See Jones*, 910 S.W.2d at 715 ("At the simplest level, appellees have the right to the pension benefits they were promised as a result of their employment, at the level promised by the Commonwealth. This right does not include oversight of every aspect of the process; its essence is the receipt of promised funds."). The circuit court, instead, stated that KRS beneficiaries have a protected property interest in the funds held by KRS, citing *Commonwealth ex rel. Armstrong v. Collins*, 709 S.W.2d 437 (Ky. 1986). There, this Court held, "[b]ecause the General Assembly has no authority to transfer private funds to the general fund, the transfer of money from agencies in which public funds and private employee contributions are commingled and cannot be differentiated [such as KRS], is unconstitutional." *Id.* at 446. We do not view *Collins* as conflicting with the *Jones* court's conclusion that the essence of KRS beneficiaries' right is the receipt of promised pension benefits, not the oversight of the system.

of those assets has no impact on their right to be paid benefits.[80] Accordingly, we are constrained to reject this argument as well.[81]

Our decision today borrows heavily from the analysis of *Thole*[82] and other federal circuit cases discussing the *constitutional standing* of beneficiaries in defined-benefit plans governed by ERISA to sue for alleged fiduciary misconduct that results in losses to the plan's assets. We recognize that ERISA does not apply to government plans,[83] including KRS. And we express no intent to construe statutory provisions governing KRS as consistent with any part of ERISA. We express no opinion on KRS beneficiaries' claims, if any, under Ky. Const. § 19. By contrast, this case concerns only the ability of beneficiaries of KRS defined-benefit plans to sue for alleged shortfalls in the KRS plan assets because of alleged administrative misconduct.

*iv. Standing as Taxpayers.*

Plaintiffs alternatively assert that they have standing as taxpayers suing on behalf of the Commonwealth to recover misspent, misused or wasted tax

---

[80] *See Thole*, 140 S. Ct. at 1619 (explaining that plan participants in a defined-benefit retirement plan, unlike beneficiaries of a private trust, possess no equitable or property interest in the plan).

[81] In a recent case, *Kentucky Emp. Ret. Sys. v. Seven Counties Services, Inc.*, 580 S.W.3d 530 (Ky. 2019), this Court acknowledged that KRS is a trust created by statute. *Id.* at 544. Our opinion today does not depart from that observation, but instead concludes that Plaintiffs, as beneficiaries of a defined-benefit plan, possess no equitable or property interest in the KRS plan assets and therefore have no standing under trust law to bring a mismanagement claim. *See Thole*, 140 S. Ct. at 1619–20.

[82] 140 S. Ct. 1620.

[83] *See* 29 USC § 1003(b)(2) ("The provisions of this subchapter shall not apply to any employee benefit plan if . . . such plan is a governmental plan (as defined in section 1002(32) of this title)[.]").

30

dollars from those responsible. Specifically, Plaintiffs point to the allegedly wasted tax dollars that were paid into KRS based on false financial and actuarial information, roughly $1.5 to $1.8 billion spent on questionable investments for KRS, and future costs to the Commonwealth in otherwise avoidable taxpayer-funded payments to KRS to make up for the alleged misconduct. But this theory of standing fails too.

Plaintiffs appear to argue both that they have standing as taxpayers harmed by the misuse of taxpayer funds *and* as taxpayers bringing claims on behalf of the Commonwealth.[84] While Kentucky courts have historically permitted taxpayer claims in certain circumstances as a matter of equity,[85] we have never allowed a suit like this.

First, taxpayers in Kentucky, on behalf of themselves, have been permitted to sue government bodies or their agents to challenge the propriety of city, county, or state tax or expenditure of public funds. Indeed, Plaintiffs cite only to cases against government entities in which taxpayers seek to enjoin the imposition of an illegal tax or expenditure of public funds or to compel compliance with certain statutory or constitutional requirements attached

---

[84] Plaintiffs' Amended Complaint and Appellant's Brief in the Writ Case both state that they are suing as taxpayers *on behalf of the Commonwealth*—thus invoking the derivative theory of taxpayer standing. But the arguments made in their brief and Amended Complaint enter the territory of traditional taxpayer claims brought by and on behalf of citizen taxpayers. *See* MUNICORP § 52:13, Citizens' and Taxpayers Suit, Standing in General (noting the two different types of taxpayer suits: "Taxpayers may have standing to sue either in their personal capacity as taxpayers or derivatively on behalf of a local governmental unit (taxpayer derivative)").

[85] *Rosenbalm v. Commercial Bank*, 838 S.W.2d 423, 427 (Ky. 1992) (citing 74 Am.Jur.2d Taxpayers' Actions § 2 (1974) at 185).

thereto.[86] Only in two cases cited by Plaintiffs do taxpayers seek any form of

monetary relief; and in both cases, county taxpayers were permitted to sue

local government officials to recover salaries illegally paid to them in excess of a

county fiscal court order.[87]

By contrast, under this direct-taxpayer theory of standing, Plaintiffs seek

damages from private third parties and KRS officials in their individual

capacities for tort damages allegedly sustained to all Kentucky taxpayers.

Plaintiffs do not cite, and we cannot find, any Kentucky cases permitting such

a novel theory of standing. Plaintiff's reference this Court's statement in

---

[86] *See id* at 423 (allowing six Bell County taxpayers to intervene, on behalf of themselves, in a suit to challenge the imposition of a county tax to pay the debts of the Bell County Garbage and Refuse Disposal District); *Gay v. Haggard*, 118 S.W. 299 (Ky. 1909) (taxpayer of Clark County bringing suit on his own behalf and the behalf of all other taxpayers of Clark County against the supervisor of Clark County roads to compel compliance with statutory competitive bidding requirements for work on public roads in the county). *Price v. Commonwealth*, 945 S.W.2d 429 (Ky. App. 1996) (taxpayers bringing suit on behalf of themselves seeking injunctive and declaratory relief to bar payment of any funds under a legislative enactment against the Commonwealth of Kentucky, Transportation Cabinet and the Secretary of Transportation in his official capacity); *Elam v. Salisbury*, 202 S.W. 56 (Ky. 1918) (taxpayer of city of Ashland seeking writ of mandamus on behalf of himself and other taxpayers against the mayor and members of the city council to compel the proper tax assessment of certain properties); *Yeoman v. Comm. of Kentucky, Health Policy Board*, 983 S.W.2d 459, 473 (Ky. 1998) (physician and patient had standing to challenge constitutionality of healthcare reform bill which allowed collection and use of certain medical data as violation of privacy rights, but not as taxpayers); and *Russman v. Luckett*, 391 S.W.2d 694 (Ky. 1965) (taxpayers bringing suit on behalf of themselves against Kentucky Department of Revenue and its Commissioner to challenge the constitutionality of Kentucky's tax assessment statutes and procedures).

[87] *See Williams v. Stallard*, 213 S.W. 197 (Ky. 1919) (taxpayers of county suing "on behalf of himself and all other taxpayers, for the use and benefit of the county" to recover money paid to the county judge of Pike County in excess of his salary as defined by a fiscal court order); *Fox v. Lantrip*, 185 S.W. 136, 139 (Ky. 1916) (taxpayer of Hopkins County brought suit on behalf of himself against county superintendent to recover money illegally appropriated and paid to the him by the fiscal court).

*Yeoman v. Comm. of Kentucky, Health Policy Bd.*[88]: "The misuse of the taxpayers' funds is one form of an alleged injury that can take place. Accordingly, any taxpayer of the Commonwealth is permitted to sue on this basis." But, for that proposition *Yeoman* cites to *Gillis v. Yount*[89] in which taxpayers challenged a statute taxing unmined coal as unconstitutional[90] *and Second Street Properties v. Fiscal Court of Jefferson Cnty, Ky.*[91] in which it was held that taxpayers of Jefferson County could not maintain an action challenging as unconstitutional statutes affecting taxes in certain counties but not others because the statute imposed no burden on taxpayers of Jefferson County.[92] And *Yeoman* did not itself deal with taxpayer standing because the plaintiffs' privacy interest in medical information, which was not related to the generation or expenditure of state funds, was sufficient.[93] As such, the *Yeoman* court was referring to the ability of taxpayers to challenge the constitutionality of statutes affecting taxes and public expenditures and therefore provides no support to Plaintiffs.

Second, Plaintiffs also purport to bring their claims on behalf of the Commonwealth as a matter of equity because they have made a demand to the Attorney General to assert their claims, but he declined. But Plaintiffs likewise

---

[88] 983 S.W.2d at 473.

[89] 748 S.W.2d 357 (Ky. 1988)

[90] *Id.* at 357.

[91] 445 S.W.2d 709, 716 (1969)

[92] *Id.*

[93] *Yeoman*, 983 S.W.2d at 473.

provide no authority in support of their ability to bring claims in a derivative capacity on behalf of the Commonwealth.

Under Kentucky law, the Attorney General, as a constitutionally elected official, is empowered to represent the Commonwealth in cases in which the Commonwealth is the real party in interest. KRS 15.020[94] provides that in the role of "chief law officer of the Commonwealth of Kentucky[.]" the Attorney General "shall exercise all common law duties and authorities pertaining to the office of the Attorney General under the common law, except when modified by statutory enactment."[95] "It is unquestioned that '[a]t common law, [the Attorney General] had the power to institute, conduct[,] and maintain suits and proceedings for the enforcement of the laws of the state, the preservation of order, and the protection of public rights.'"[96] This authority necessarily includes the "broad powers to initiate and defend actions on behalf of the people of the Commonwealth."[97]

---

[94] Under Ky. Const. § 91, the Attorney General is an elected constitutional officer whose "duties . . . shall be prescribed by law." And "[t]he General Assembly has prescribed the Attorney General's duties and responsibilities in KRS § 15.020 . . . ." *Commonwealth ex rel. Beshear v. Commonwealth Office of the Governor ex rel. Bevin*, 498 S.W.3d 355, 361 (Ky. 2016).

[95] *See also Commonwealth ex rel. Hancock v. Paxton*, 516 S.W.2d 865, 867 (Ky.1974) (stating that the Attorney General "is possessed of all common law powers and duties of the office except as modified by the Constitution or statutes.").

[96] *Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 173 (Ky. 2009) (citing *Paxton*, 516 S.W.2d at 867).

[97] *Id. See also, id.* ("It is the Attorney General's responsibility to file suit to vindicate public rights, as attorney for the people of the State of Kentucky." (quoting *Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610, 618 (Ky. 1992), *overruled by Thompson*, 300 S.W.3d 152 (internal quotation marks omitted)). Other states have similarly concluded that their Attorneys General have the exclusive authority to sue on behalf of the state when the state is the only real party in interest. *See e.g., Lyons v.*

As a constitutionally elected officer, the Attorney General is entrusted with broad discretion in the performance of his duties, which includes evaluating the evidence and other facts to determine whether a particular claim should be brought.[98] And, importantly, when the Attorney General turns to outside counsel to assert claims belonging to the Commonwealth, their relationship is governed by strict statutory procurement and oversight requirements.[99]

But in this case, not only has the Attorney General presumably exercised his discretion in declining to bring the Plaintiffs' claims, but he is also wholly uninvolved with the litigation. Plaintiffs do not assert that the Attorney General has authorized this suit, assigned a portion of the claims' recovery to the parties involved, or even that he has tacitly approved of their litigation. Instead,

---

*Ryan,* 780 N.E.2d 1098, 1103 (Ill. 2002) (recognizing "that the Attorney General is the sole officer authorized to represent the People of this State in any litigation in which the People of the State are the real party in interest" (citing *People ex rel. Scott v. Briceland,* 359 N.E.2d 149 (1976))).

[98] *See* 7A C.J.S. *Attorney General* § 30 ("Ordinarily, the state attorney general exercises the functions incident to the office with discretion, including particularly large discretion in matters of public concern or compelling public interest, and prosecutorial discretion.") (citations omitted). *See also Lyons v. Ryan,* 780 N.E.2d 1098, 1104–05 (Ill. 2002) ("The Attorney General, as an elected representative of the citizens of this state, is responsible for evaluating the evidence and other pertinent factors to determine what action, if any, can and should properly be taken and what penalties should be sought.") (citations omitted).

[99] *See Landrum v. Commonwealth ex rel. Beshear,* No. 2018-SC-000122-TG, 2019 WL 4072505, at *4–6 (Ky. Aug. 29, 2019) (holding that any possible recovery from lawsuit in which the Office of Attorney General had hired outside counsel to pursue tort claims against opioid manufacturers on behalf of Kentucky constituted "public funds" and the contract was therefore subject to contracting-oversight requirements of the Model Procurement Code).

Plaintiffs lawsuit proceeds entirely independent of the Office of the Attorney General, and no oversight requirements governing the litigation apply.

Given that taxpayer claims are governed to a large extent by equity principles,[100] and taking into consideration the stringent oversight requirements otherwise imposed on outside counsel hired by the Attorney General, we conclude Plaintiffs also lack standing under this theory.

### III. CONCLUSION.

Ultimately, this Court recognizes that Plaintiffs allege significant misconduct, but, as a matter of law, these eight Plaintiffs, as beneficiaries of a defined-benefit plan who have received all of their vested benefits so far and are legally entitled to receive their benefits for the rest of their lives, do not have a concrete stake in this case. And without a concrete stake in the case, the Plaintiffs lack constitutional standing to bring their claims in our courts. We remand this case to the circuit court with direction to dismiss the complaint.

All sitting. All concur.

COUNSEL FOR APPELLANTS RANDY OVERSTREET AND BOBBY D. HENSON:

Richard M. Guarnieri
Philip Coleman Lawson
True Guarnieri Ayer, LLP

COUNSEL FOR APPELLANT WILLIAM S. COOK:

Glen Alan Cohen
Lynn M. Watson
Seiller Waterman, LLC

---

[100] *Rosenbalm*, 838 S.W.2d at 427 (citing 74 Am.Jur.2d Taxpayers' Actions § 2 (1974) at 185).

COUNSEL FOR APPELLANT TIMOTHY LONGMEYER:

Laurence John Zielke
John H. Dwyer Jr.
Karen Campion Jaracz
Zielke Law Firm, PLLC

COUNSEL FOR APPELLANT THOMAS ELLIOTT:

Mark David Guilfoyle
J. Kent Wicker
Patrick Raymond Hughes
Andrew Douglas Pellino
Dressman, Benzinger & Lavelle, PSC

COUNSEL FOR APPELLANT JENNIFER ELLIOTT:

John Witt Phillips
Susan Daunhauer Phillips
David Sean Ragland
Phillips Parker Orberson & Arnett, PLC

COUNSEL FOR APPELLANT VINCE LANG:

Brent L. Caldwell
Caldwell Law Firm, PLLC

Noel Embry Caldwell
Noel Caldwell, Attorney at Law

COUNSEL FOR BRENT ALDRIDGE:

Michael L. Hawkins
Michael L. Hawkins & Associates, PLLC

COUNSEL FOR T.J. CARLSON:

Albert F. Grasch Jr.
John Melvin Camenisch Jr.
James Wesley Harned
Rose Grasch Camenisch Mains, PLLC

37

COUNSEL FOR DAVID PEDEN:

David J. Guarnieri
Jason Hollon
McBrayer McGinnis Leslie & Kirkland, PLLC

Kenton Knickmeyer
Thompson Coburn LLP

COUNSEL FOR WILLIAM A. THIELEN:

Stewart Christopher Burch
Kevin Patrick Fox
Logan Burch & Fox

COUNSEL FOR APPELLEES JEFFREY C. MAYBERRY AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON BEHALF OF THE KENTUCKY
RETIREMENT SYSTEMS, AND AS TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY; HONORABLE BRANDY O. BROWN, AS
MEMBER AND BENEFICIARY OF TRUST FUNDS ON BEHALF OF THE
KENTUCKY RETIREMENT SYSTEMS, AND AS TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY; MARTHA MICHELLE MILLER, AS
MEMBER AND BENEFICIARY OF TRUST FUNDS ON BEHALF OF THE
KENTUCKY RETIREMENT SYSTEMS, AND AS TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY; STEVE ROBERTS, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON BEHALF OF THE KENTUCKY
RETIREMENT SYSTEMS, AND AS TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY; AND, TERESA STEWART, AS MEMBER
AND BENEFICIARY OF TRUST FUNDS ON BEHALF OF THE KENTUCKY
RETIREMENT SYSTEMS, AND AS TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY:

Jeffrey M. Walson
Walson Law-Consultancy-Mediation

Francis A. Bottini Jr
Michelle Ciccarelli Lerach
Albert Y. Chang
Bottini & Bottini, Inc.

Jonathan W. Cuneo
Monica Miller
Cuneo Gilbert & Laduca, LLP

James Baskin III
Casey Dobson
Scott Douglass McConnico LLP

David Black

COUNSEL FOR JASON LAINHART, AS MEMBER AND BENEFICIARY OF
TRUST FUNDS ON BEHALF OF THE KENTUCKY RETIREMENT SYSTEMS,
AND AS TAXPAYER ON BEHALF OF THE COMMONWEALTH OF KENTUCKY;
DON. D. COOMER, AS MEMBER AND BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT SYSTEMS, AND AS TAXPAYER ON
BEHALF OF THE COMMONWEALTH OF KENTUCKY; AND, BEN WYMAN, AS
MEMBER AND BENEFICIARY OF TRUST FUNDS ON BEHALF OF THE
KENTUCKY RETIREMENT SYSTEMS, AND AS TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY:

Ann B. Oldfather
Oldfather Law Firm

Michelle Ciccarelli Lerach
Bottini & Bottini, Inc.

Vanessa B. Cantley
Patrick E. Markey
Bahe Cook Cantley & Nefzger, PLC

Johnathan W. Cuneo
Monica Miller
Cuneo Gilbert & LaDuca, LLP

David Black

James Baskin III
Stanley Kuczaj
Sameer Hashmi
David Shank
Paige Amstutz
Jane Webre
Casey Dobson
Scott Douglass McConnico, LLP

COUNSEL FOR APPELLEES KKR & CO., L. P., HENRY R. KRAVIS; AND,
GEORGE R. ROBERTS;

Barbara B. Edelman
Grahmn New Morgan

John Moose Spires
Dinsmore & Shohl, LLP

Barry Barnett
Abigail Noebels
Ryan Weiss
Steven Shepard
Susman Godfrey, LLP

COUNSEL FOR APPELLEES PRISMA CAPITAL PARTNERS, LP, PACIFIC
ALTERNATIVE ASSET MANAGEMENT COMPANY, LLC; GIRISH REDDY, AND,
JANE BUCHAN:

Barbara B. Edelman
Grahmn New Morgan
John Moose Spires
Dinsmore & Shohl, LLP

Peter E. Kazanoff
Paul C. Curnin
David Elbaum
Michael J. Garvey
Sara A. Ricciardi
Michael S. Carnevale
Simpson Thacher & Barlett, LLP

COUNSEL FOR APPELLEES BLACKSTONE GROUP, L.P., BLACKSTONE
ALTERNATIVE ASSET MANAGEMENT COMPANY, L.P., STEVEN A.
SCHARZMAN; AND, J. TOMILSON HILL:

Virginia Hamilton Snell
Donald Joseph Kelly
Jordan White
Wyatt, Tarrant & Combs, LLP

Brad S. Karp
Lorin L. Reisner
Andrew J. Ehrlich
Brette Tannenbaum
Paul, Weiss, Rifkind, Wharton & Garrison LLP

COUNSEL FOR APPELLEES R.V. KUHNS & ASSOCIATES, INC., REBECCA A.
GRATSINGER; AND, JIM VOYTKO:

Philip Wallace Collier
Thad Montgomery Barnes

40

Jeffrey Moad
Stites & Harbison PLLC

COUNSEL FOR APPELLEE ICE MILLER, LLP:
Susan J. Pope
Cory Jay Skolnick
Frost Brown Todd LLC

COUNSEL FOR APPELLEES CAVANAUGH MACDONALD CONSULTING, LLC,
THOMAS J. CAVANAUGH; TODD B. GREEN; AND, ALISA BENNETT

Charles E. English Jr.
Elizabeth Kenly Ames
English, Lucas, Priest & Owsley

Robert G. Brazier
Steven G. Hall
Baker Donelson Bearman Caldwell & Berkowitz, PC

COUNSEL FOR APPELLEE GOVERNMENT FINANCE OFFICERS
ASSOCIATION:

Dustin Elizabeth Meek
Melissa Mahurin Whitehead
Tachau Meek PLC

COUNSEL FOR APPELLEE KENTUCKY RETIREMENT SYSTEMS:

Perry Mack Bentley
Paul C. Harnice
Sarah Jackson Bishop
Christopher E. Schaefer
Chadler Hardin
Connor Bailey Egan
Andrew Thomas Hagerman
Stoll, Keenon & Ogden, PLLC

Matthew Dawson Wingate

41

RANDY OVERSTREET; BOBBY D. HENSON;                    APPELLANTS
WILLIAM S. COOK; TIMOTHY
LONGMEYER; THOMAS ELLIOTT;
JENNIFER ELLIOTT; AND, VINCE LANG


                    ON TRANSFER FROM COURT OF APPEALS
V.                          CASE NO. 2019-CA-000012
                    FRANKLIN CIRCUIT COURT NO. 17-CI-01348
                    HONORABLE PHILLIP J. SHEPHERD


JEFFREY C. MAYBERRY, AS MEMBER AND                    APPELLEES
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
HONORABLE BRANDY O. BROWN, AS
MEMBER AND BENEFICIARY OF TRUST
FUNDS ON BEHALF OF THE KENTUCKY
RETIREMENT SYSTEMS, AND AS
TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY;
MARTHA MICHELLE MILLER, AS
MEMBER AND BENEFICIARY OF TRUST
FUNDS ON BEHALF OF THE KENTUCKY
RETIREMENT SYSTEMS, AND AS
TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY; STEVE
ROBERTS, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
TERESA STEWART, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
JASON LAINHART, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;

DON. D. COOMER, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
BEN WYMAN, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
KKR & CO. L.P.; HENRY R. KRAVIS;
GEORGE R. ROBERTS; PRISMA CAPITAL
PARTNERS LP; PACIFIC ALTERNATIVE
ASSET MANAGEMENT COMPANY, LLC;
GIRISH REDDY; JANE BUCHAN;
BLACKSTONE GROUP, L.P.; BLACKSTONE
ALTERNATIVE ASSET MANAGEMENT
COMPANY, L.P.; STEVEN A. SCHARZMAN;
J. TOMILSON HILL; R.V. KUHNS &
ASSOCIATES, INC.; REBECCA A.
GRATSINGER; JIM VOYTKO; ICE MILLER,
LLP; CAVANAUGH MACDONALD
CONSULTING, LLC; THOMAS J.
CAVANAUGH; TODD B. GREEN; ALISA
BENNETT; GOVERNMENT FINANCE
OFFICERS ASSOCIATION; KENTUCKY
RETIREMENT SYSTEMS; DAVID PEDEN;
BRENT ALDRIDGE; T. J. CARLSON; AND,
WILLIAM A. THIELEN


AND

2019-SC-00042-TG


BRENT ALDRIDGE; T.J. CARLSON; DAVID                          APPELLANTS
PEDEN; AND, WILLIAM THIELEN


                        ON TRANSFER FROM COURT OF APPEALS
V.                         CASE NO. 2019-CA-000016
                        FRANKLIN CIRCUIT COURT NO. 17-CI-01348
                        HONORABLE PHILLIP J. SHEPHERD

JEFFREY C. MAYBERRY AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
HONORABLE BRANDY O. BROWN, AS
MEMBER AND BENEFICIARY OF TRUST
FUNDS ON BEHALF OF THE KENTUCKY
RETIREMENT SYSTEMS, AND AS
TAXPAYER ON BEHALF OF THE
COMMONWEALTH OF KENTUCKY;
MARTHA MICHELLE MILLER, AS MEMBER
AND BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
STEVE ROBERTS, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
TERESA STEWART, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
JASON LAINHART, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
DON. D. COOMER, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
BEN WYMAN, AS MEMBER AND
BENEFICIARY OF TRUST FUNDS ON
BEHALF OF THE KENTUCKY RETIREMENT
SYSTEMS, AND AS TAXPAYER ON BEHALF
OF THE COMMONWEALTH OF KENTUCKY;
KKR & CO. L.P.; HENRY KRAVIS; GEORGE
ROBERTS; PRISMA CAPITAL PARTNERS
LP; PACIFIC ALTERNATIVE ASSET
MANAGEMENT COMPANY, LLC; GIRISH
REDDY; JANE BUCHAN; BLACKSTONE

APPELLEES

GROUP, L.P.; BLACKSTONE ALTERNATIVE
ASSET MANAGEMENT COMPANY, L.P.;
STEVEN A. SCHARZMAN; J. TOMILSON
HILL; R.V. KUHNS & ASSOCIATES, INC.;
REBECCA A. GRATSINGER; JIM VOYTKO;
ICE MILLER, LLP; CAVANAUGH
MACDONALD CONSULTING, LLC; THOMAS
CAVANAUGH; TODD GREEN; ALISA
BENNETT; GOVERNMENT FINANCE
OFFICERS ASSOCIATION; KENTUCKY
RETIREMENT SYSTEMS; WILLIAM S.
COOK; RANDY OVERSTREET; TIMOTHY
LONGMEYER; BOBBY D. HENSON;
THOMAS ELLIOTT; JENNIFER ELLIOTT;
AND, VINCE LANG

## ORDER

Being fully and sufficiently advised, the Court ORDERS that

1. Plaintiffs-Appellees' Motion for Leave to Submit New Authorities is
   DENIED;

2. Appellants-Defendants' Joint Motion for Leave to File Amended Joint
   Response to Plaintiffs-Appellees' Motion for Leave to Submit New
   Authorities is DENIED;

3. Plaintiffs-Appellees' Motion for Leave to Submit a Reply is DENIED.

   All sitting. All concur.

ENTERED: July 9, 2020

_____
CHIEF JUSTICE